UNITED STATES of America, Appellee,

v.

Anthony Phillip TARVERS, Jr.,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Richard J. BRENNER,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Terrence J. O'DUGGAN,
Defendant, Appellant.

Nos. 85–1979, 85–1980 and 85–1981.

United States Court of Appeals,
First Circuit.

Heard Oct. 6, 1987.
Decided Nov. 24, 1987.

Michael A. Collora, Boston, Mass., with whom Michael L. Leshin and Hemenway & Barnes, Boston, Mass., were on brief, for appellant Terrence J. O'Duggan.

* Of the Second Circuit, sitting by designation.

Joseph M. Flak, Boston, Mass., with whom Mark Blair Bigelow, Boston, Mass., was on brief, for appellant Anthony Phillip Tarvers, Jr.

William P. Homans, Jr., Boston, Mass., with whom Homans, Hamilton, Dahmen & Marshall, Boston, Mass., was on brief, for appellant Richard J. Brenner.

Kevin E. Sharkey, Asst. U.S. Atty., Boston, Mass., with whom Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, Circuit Judge, TIMBERS,* Senior Circuit Judge, and SELYA, Circuit Judge.

TIMBERS, Circuit Judge:

Appellants Anthony Phillip Tarvers, Jr. ("Tarvers"), Richard J. Brenner ("Brenner"), and Terrence J. O'Duggan ("O'Duggan") appeal from judgments of conviction entered December 3, 1985 in the District of Massachusetts, A. David Mazzone, *District Judge.* Following a three week jury trial, Tarvers was convicted, among other charges, of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848 (1982); conspiracy to possess cocaine and quaaludes with intent to distribute, in violation of 21 U.S.C. § 846 (1982); and conspiracy to impede and obstruct the Internal Revenue Service ("IRS") in the performance of its duties, in violation of 18 U.S.C. § 371 (1982) ("Count VII"). O'Duggan and Brenner also were convicted, as charged in Count VII, of conspiracy to impede and obstruct the IRS. In addition, Brenner was convicted of conspiracy to possess cocaine with intent to distribute and possessing cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1) (1982), and 18 U.S.C. § 2 (1982).

We find that the two principal issues on appeal arise from: (1) Tarvers' claim that the court erred in instructing the jury that, to convict Tarvers of engaging in a continuing criminal enterprise, they need not agree on the identities of the five or more persons who worked under Tarvers' management; and (2) the claim of O'Duggan and

Brenner that Count VII failed to state an offense with sufficient specificity, as well as O'Duggan's assertion that the government failed to prove this count with respect to him. Other subordinate issues are raised.

For the reasons set forth below, we affirm in part and reverse and remand in part.

### I.

We summarize those facts believed necessary to an understanding of the issues raised on appeal. A somewhat detailed summary is appropriate because of the nature of the case and the long period of time involved. Viewing the evidence, as we must at this stage of the case, in the light most favorable to the government, there was evidence from which the jury could have found the following facts.

In essence, this case involves a long-term conspiracy to distribute cocaine. According to the co-conspirators who later testified against him, Tarvers began to deal in marijuana in January 1977. In the spring of that year, the IRS investigated Tarvers for failure to pay income taxes and ultimately levied on his bank account and other assets. Tarvers made several payments to the IRS but then moved from Massachusetts to Florida. In June 1977, Tarvers worked as a salesman for Richard Loring ("Loring"). He asked that Loring pay him only a nominal salary and give him an expensive car. Loring later testified that Tarvers had made this arrangement because "the IRS was on his back" and he wanted "to beat the system".

*Tarvers' Introduction to Narcotics Trafficking*

While in Florida, Tarvers began trafficking in cocaine on a regular basis. First he met Tom Henrie ("Henrie"), who later testified against him in exchange for immunity from prosecution. In January 1979, Tarvers told Henrie that he had been transporting marijuana from Florida to Cape Cod, and that he planned to switch to cocaine because its lesser volume made it less conspicuous. In the spring of 1979, Tarvers, Henrie and at least one other trans-ported high quality cocaine from Florida to Cape Cod.

Also in the spring of 1979, Tarvers met Chris Schaefer ("Schaefer"), who, like Henrie, later testified against Tarvers. Schaefer introduced Tarvers to Kenny DiMartini ("DiMartini"). Tarvers was told by DiMartini that he and Schaefer could distribute cocaine for Tarvers in Louisiana. DiMartini showed Tarvers and Henrie a method for "cutting" or "rerocking" cocaine, a process which lessens the purity of the drug while increasing its volume. DiMartini's method failed because it produced cocaine of such low quality that it was difficult to sell.

Sometime before June 1979, Jeremiah Monroe ("Monroe") introduced Tarvers to Dirk Gregory Letares ("Letares") who began selling cocaine for Tarvers. Monroe was paid a commission by Tarvers for the introduction. Letares showed Tarvers a more successful method for rerocking cocaine. It is at this point that, according to the evidence, Brenner definitely became involved in the conspiracy, since it was at Brenner's apartment that Letares demonstrated his rerocking method. Moreover, Brenner suggested that Tarvers try to use leather handbag presses at Brenner's factory to rerock the cocaine. This experiment failed. Tarvers continued using Letares' method.

Between July 1979 and August 1980, witnesses observed Tarvers, along with Henrie and Schaefer and others, regularly bringing cocaine from Tarvers' home in Boca Raton, Florida to Cape Cod. Tarvers' supplier at this time for both cocaine and marijuana was John Tedesco.

*O'Duggan's Involvement: The Camper, Loan and Credit Card*

In November 1979, at Tarvers' request, Henrie drove a camper from Florida to Cape Cod. Henrie and Schaefer both testified that Tarvers had told them that the camper belonged to O'Duggan. Tarvers told Henrie that the camper had been used to transport marijuana; that someone named "Bunky" or "Bumpy" had stolen it at an earlier time in 1979, either in North or South Carolina; that Tarvers had told

O'Duggan of the theft; and that the camper later had turned up in one of the Carolinas. O'Duggan reported the theft to the police on July 4, 1979 and said that it had been stolen in Massachusetts. Henrie initially was apprehensive about using the camper because it had been reported stolen and he "didn't know if the police were watching it or what." Nevertheless, after his conversation with Tarvers, Henrie picked up the camper at Tarvers' home in Florida.

At one point in 1979, Schaefer and Tarvers had accumulated $90,000. Schaefer suggested using this money to buy cocaine in volume. Tarvers demurred, explaining that he had borrowed money from O'Duggan to "get started in the cocaine business" and wanted to use the $90,000 in part to repay O'Duggan. Tarvers therefore bought only one kilogram and used the remaining money to repay the loan. Tarvers told Henrie that the amount he owed O'Duggan was $50,000. Schaefer was told by Tarvers that he had O'Duggan put him on O'Duggan's payroll for tax purposes. In addition, O'Duggan obtained an American Express Gold Card for Tarvers in early 1980. At about this time, O'Duggan revealed some knowledge of the conspiracy by asking Schaefer, as he was driving Schaefer to the airport, whether he "got nervous carrying drugs on the airplane."

In January 1980, Schaefer began selling quaaludes for Tarvers. On one occasion, Schaefer repaid Tarvers for the quaaludes at a dinner at which Brenner was present. Schaefer brought the money in a pillow case. Tarvers also sold quaaludes through Monroe who had introduced Tarvers to Letares in exchange for a commission on subsequent cocaine sales made by Letares for Tarvers. Tarvers instructed Monroe to send the proceeds of the quaaludes sales to the post office box address for Universal Cosmetics ("Universal"), a company Tarvers had organized sometime in late 1979 or early 1980. Universal was in the business of producing nail polish remover. In two years, however, it had sold only fifty cases of its product. Brenner rented the post office box for Universal.

Tarvers continued selling large amounts of cocaine through Letares until late in the summer of 1980. At the end of 1980, Letares and Monroe had a dispute with Tarvers over Monroe's commissions. After reaching a new agreement with Tarvers, Letares and Monroe continued selling Tarvers' cocaine, although in smaller amounts, until at least July or August 1981. During this period, Tarvers told Letares that Brenner was his "50/50" partner. When Tarvers went on vacation in the summer of 1981, he told Letares to get cocaine from Brenner in Tarvers' absence. Letares did so on several occasions. He paid Brenner directly for the cocaine.

Beginning in the fall of 1981, Tarvers began selling cocaine through John Bowes ("Bowes"). Tarvers told Bowes to speak to Brenner about obtaining cocaine whenever Tarvers was absent. On one occasion, Tarvers gave Bowes cocaine in Brenner's presence. Throughout 1982, Brenner delivered to Bowes parcels containing up to half a pound of cocaine and received payment from Bowes. Bowes also went to Brenner's home on Cape Cod to pick up cocaine or to make payments for it.

In 1980, Schaefer was arrested in Louisiana. He was found with substantial amounts of cocaine and marijuana on his person and documents showing his involvement in the conspiracy. These documents included business cards for Brenner and O'Duggan; a personal telephone book containing phone numbers for the three appellants; documents showing that he recently had bought dinner in New Orleans for Brenner and Tarvers; a luggage tag bearing Henrie's name; and receipts for plane tickets known to have been used for transportation of cocaine.

On August 25, 1981, Letares was injured badly in an automobile accident. Brenner found Letares injured and telephoned the police. The police found marijuana in Letares' possession and arrested him, charging him with speeding, possession of marijuana and other offenses. It was in exchange for a dismissal of these charges that Letares agreed to testify against appellants.

*Real Estate Transactions*

In an attempt to hide from the IRS his ownership of property, Tarvers purchased several parcels of real estate, using real estate trusts, of which he was the sole beneficiary and for which either Brenner or O'Duggan served as trustee. Essentially four properties were involved.

The first property was Tarvers' former home at 324 Main Street, Brewster, Massachusetts ("324 Main Street"). On November 3, 1976, approximately two and one-half years after separating from his wife, Mary Ann Tarvers, Tarvers deeded his interest in 324 Main Street to her. In 1979, Tarvers asked his wife if he could purchase the house from her. She agreed on February 6, 1980 to sell the house to Tarvers for $91,500. On March 10, 1980, at Tarvers' request, the property was deeded to the West Brewster Realty Trust, of which O'Duggan was trustee. In addition to paying for the house, Tarvers assumed the first and second mortgages on the property. The house later was refinanced. In connection with this refinancing, O'Duggan submitted a personal financial statement and mortgage application. A loan was subsequently granted to O'Duggan, as trustee of West Brewster Realty Trust, and checks for $38,216 and $39,336.81 were drawn to O'Duggan's order. O'Duggan deposited these checks in his corporate bank account.

The second property was an undeveloped parcel of land described as Lot 13. Tarvers contacted a broker to initiate the purchase; paid down payments to the owner of the property; executed a purchase and sale agreement with the owner on December 24, 1980; and, on March 6, 1981, paid the balance of the purchase price. At Tarvers' request, the property was deeded to Brenner as trustee of Brewster Realty Trust, even though the owner had never dealt with Brenner. Tarvers was billed personally for the legal fees. In 1984, Tarvers prepared to sell Lot 13. At this time, he told Herbert Montgomery ("Montgomery"), an attorney, that he was the sole beneficiary of Brewster Realty Trust, and had Montgomery prepare a purchase and sale agreement describing Brewster Realty Trust as the seller. Tarvers asked that Montgomery deliver the proceeds of the sale to Tarvers' house.

The third property was located at 28 Spring Street, Hyannis, Massachusetts ("28 Spring Street"). The original owner of the property, Paul Aiken ("Aiken"), prepared three different deeds, because, according to his testimony, he wished to retain an advantageous mortgage rate by preventing the bank from learning the actual nature of the transaction. Although the record does not clearly reveal just what purpose the three separate deeds were intended to serve, it strongly suggests that the parties intended to conceal that Tarvers was the true purchaser. The first deed described the purchasers as Aiken and the Mark and Stephen Realty Trust, of which Aiken and O'Duggan were trustees. This deed was recorded in 1979, at the time of the sale. The second deed described the purchaser as Richard Brenner, trustee of Brewster Realty Trust. This deed was executed in 1979, but not recorded until 1984, when the 1979 date was erased and replaced with the date "1984". The third deed described the purchaser as Tarvers personally. This deed was never recorded. Bills for taxes on 28 Spring Street were sent to O'Duggan and were paid by Tarvers. When Tarvers sold the property in 1984, he had Brenner sign the purchase and sale agreement as the seller and requested that Brenner's signature as the seller appear on the closing agreement. Checks representing the proceeds of the sale were made payable to Brenner but were deposited in Tarvers' personal account.

The fourth property was located at 21 Columbus Avenue, Hyannis, Massachusetts ("21 Columbus Avenue"). Tarvers offered to buy the property in the middle of 1980. He made several down payments and paid off a second mortgage. In October 1981, the property was deeded to Brewster Realty Trust. Tarvers assumed the first mortgage and paid the owner $15,000. O'Duggan later told the owner that O'Duggan owned an interest in the property.

On April 30, 1982, the first mortgage on 21 Columbus Avenue was assigned to

O'Duggan as trustee of the Mark and Stephen Realty Trust. At about the same time, O'Duggan agreed to sell the property for $150,000. The purchasers executed an offer to purchase, which O'Duggan signed as a "beneficiary" of the Brewster Realty Trust. The purchasers made their checks payable to O'Duggan and the Brewster Realty Trust. The day before the closing O'Duggan asked the purchasers to pay $45,000 of the balance of the purchase price in cash, saying "I want it in cash as in brown paper bags". The purchasers agreed. Moreover, a check for $19,338.38, drawn to the order of Brenner as trustee of the Brewster Realty Trust, was deposited by O'Duggan in his own account by the use of Universal Cosmetics.

O'Duggan and the purchasers agreed to alter the closing statement and deed to indicate a sale price of $106,000, although the actual price was $150,000. The deed stated that the seller was Richard Brenner, acting as trustee of the Brewster Realty Trust. Tarvers later paid the broker a fee for introducing him to the original owner of the property. The bill for legal services was sent to O'Duggan for the Brewster Realty Trust.

Tarvers twice borrowed money and used two of these properties as security for the loans. The mortgage papers set forth only Brenner, trustee of the Brewster Realty Trust, as the mortgagor.

At an interview with the IRS on October 4, 1984, Brenner admitted to Edward S. Jay ("Jay"), a special agent with the Criminal Investigation Division of the IRS, that he acted as a trustee for Tarvers to disguise the true ownership of the properties. When Jay asked Brenner from whom Tarvers wished to hide his ownership of the real estate, Brenner answered, "Probably from you guys" (referring to the IRS).

Facts other than those summarized above will be referred to in our discussion of appellants' claims of error in parts II–V of this opinion.

*Indictments and Convictions*

On April 17, 1985, appellants were indicted upon several conspiracy and substantive charges. Tarvers was indicted for: (1) engaging in a criminal enterprise, in violation of 21 U.S.C. § 848 (1982) ("Count I"); (2) conspiracy to possess cocaine and quaaludes with intent to distribute, in violation of 21 U.S.C. § 846 (1982) ("Counts II and V"); possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2 (1982) ("Counts III and IV"); using a communication facility in causing or facilitating the commission of a felony, in violation of 21 U.S.C. § 843(b) (1982) and 18 U.S.C. § 2 (1982) ("Count VI"); and conspiracy to obstruct an agency of the United States, in violation of 18 U.S.C. § 371 (1982) ("Count VII"). Brenner and O'Duggan were indicted on Counts II, III, IV and VII. Count VII arose out of the agreement by Brenner and O'Duggan to act as trustees of real estate trusts for three parcels owned by Tarvers, the purpose of which was to disguise Tarvers' ownership of these properties.

After a three week jury trial beginning September 10, 1985 and ending October 1, 1985, Tarvers was found guilty on all charges; O'Duggan was found guilty on Count VII; and Brenner was found guilty on Counts II, IV and VII. Under § 848, the Continuing Criminal Enterprise statute, ("CCE Statute"), the court ordered the forfeiture of the property Tarvers had derived from the enterprise. The court sentenced each appellant to prison terms, special parole terms, fines or a combination thereof. Tarvers is serving his prison sentence. O'Duggan and Brenner are out on bail pending appeal.

For the reasons stated below, we affirm in part and reverse and remand in part.

II.

CCE statute, 21 U.S.C. § 848, requires the government to prove that a defendant charged under the statute "occupied the position of organizer, a supervisory position, or any other position of management" with respect to at least five other persons. 21 U.S.C. § 848(b)(2)(A) (1982).

One of the two principal issues raised on appeal is whether the CCE statute requires the jury to agree unanimously on the identities of five particular persons, or whether it permits individual jurors to differ as to which particular persons constituted the group of five.

Tarvers claims that it was reversible error for the court, over objection, to have instructed the jury that it did not have to agree unanimously on the identities of five particular persons. Specifically he claims that the court erred when it instructed the jury as follows:

> "You do not have to agree on the identities of the five people. You don't have to unanimously agree. In other words, it doesn't require all 12 of you to sit and say, 'I find that A, B, C, D, and E, are the five people.' It may be that all 12 of you have a different combination of five people."

Tarvers argues in view of this instruction that we should reverse his conviction on Count I. We disagree.

The CCE statute requires that four elements be established: (1) the defendant committed a violation constituting a drug offense punishable as a felony; (2) the violation was part of a "continuing series" of drug violations; (3) the defendant acted in concert with five or more other persons, with respect to whom the defendant occupied the position of an organizer, supervisor or manager; and (4) the defendant obtained substantial income or resources from the drug violations. *Garrett v. United States*, 471 U.S. 773, 781 (1985). The purpose of the statute is "to reach the 'top brass' in the drug rings, not the lieutenants and foot soldiers." *Id.*

We have not yet had the occasion to address the particular issue as to whether the third element refers to five specific persons or simply defines the size of the enterprise. Only the Seventh Circuit has addressed the issue directly. In *United States v. Markowski*, 772 F.2d 358 (7th Cir.1985), *cert. denied*, 475 U.S. 1018 (1986), the Seventh Circuit stated that the CCE statute "does not make the identity of the five [subordinates] important.... The

CCE statute is directed against all enterprises of a certain size; the identity of those involved is irrelevant." *Id.* at 364. Thus, the only other court of appeals to have ruled on the issue now before us has held that the statute does not require unanimity as to the identity of the five subordinates.

Tarvers nevertheless argues that the reliance by the *Markowski* court on three cases, i.e., *United States v. Wilkinson*, 754 F.2d 1427 (2d Cir.), *cert. denied sub nom. Shipp v. United States*, 472 U.S. 1019 (1985), *United States v. Mangieri*, 694 F.2d 1270 (D.C.Cir.1982), and *United States v. Raffone*, 693 F.2d 1343 (11th Cir.1982), *cert. denied sub nom. Farese v. United States*, 461 U.S. 931 (1983), was misplaced and that these cases actually support his position. A close reading of these cases satisfies us, however, that, while they treated the issue indirectly, the courts simply did not reach the issue now before us because they rejected the claims of error on other grounds. The court's language in *Raffone*, moreover, actually supports the government's position in the instant case. The court in that case expressed doubt as to whether it would have been correct to instruct the jury that it must be unanimous on the identities of the five subordinates and stated that it was unable to find any case support for such a proposition in the law on ordinary conspiracy. *Raffone, supra*, 693 F.2d at 1348.

Our refusal to require unanimity as to the identity of the five subordinates is consistent with decisions in other conspiracy cases not involving the CCE statute in which unanimity was not required with respect to a specific fact underlying an element. *See, e.g., United States v. Balistrieri*, 779 F.2d 1191, 1224 (7th Cir.1985) (upholding instruction that failed to require unanimity as to which state law defendant had violated before he could be convicted under statute proscribing operation of gambling business in violation of state law), *cert. denied*, 106 S.Ct. 1490 (1986); *United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir.1983) (upholding refusal to give instruction that jury must be unani-

mous as to which act of possession constituted crime of possession of narcotic with intent to distribute). Moreover, our holding is consistent with the purpose of the statute, which is directed at reaching the "top brass" of a sizeable enterprise. *Garrett v. United States, supra,* 471 U.S. at 781.

We hold that the district court correctly instructed the jury that it was not required to reach a unanimous agreement as to the identities of the five persons for whom Tarvers acted in a supervisory capacity.

### III.

■■■ The other principal issue raised on appeal relates to Count VII which charged the three appellants with conspiring "to defraud the United States by impeding, obstructing, and defeating the lawful governmental actions of the Internal Revenue Service", in violation of 18 U.S.C. § 371 (1982). Only O'Duggan and Brenner have challenged their convictions on this count. They raise three related arguments: (1) they both claim that Count VII fails to state an offense because it does not set forth the elements of the offense with sufficient specificity; (2) they both also claim that the court should have granted their motions for bills of particulars as to Count VII; and (3) O'Duggan claims that the court should have granted his motion for acquittal on Count VII because the government failed to prove his knowledge of or participation in the conspiracy. We shall discuss these claims seriatim.

Under their insufficient specificity claim, O'Duggan and Brenner contend that Count VII was inadequate because it omitted the name of the specific person or entity whose tax liability they endeavored to conceal, and failed to state the years they impeded the IRS. They assert that, since they were not given this information, they were effectively prevented from preparing a defense. Moreover, they further assert that the indictment failed to comply with Fed.R. Crim.P. 7(c)(1), which provides that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." We disagree.

First, § 371 does not require the indictment to identify the person or entity whose tax liability the defendants have conspired to conceal. *United States v. Hajecate,* 683 F.2d 894, 897 (5th Cir.1982), *cert. denied sub nom. Eisenberg v. United States,* 461 U.S. 927 (1983). Indeed, a conspiracy charge under § 371 is sufficient as long as it (1) charges that there was an agreement, (2) describes the unlawful acts toward which the agreement was directed, and (3) charges that the defendants committed an overt act in furtherance of the agreement. *United States v. Giese,* 597 F.2d 1170, 1177 (9th Cir.), *cert. denied,* 444 U.S. 979 (1979). The statute does not require that the means used to achieve the unlawful goal of the conspiracy be unlawful. *United States v. Turkish,* 623 F.2d 769, 771 (2d Cir.1980), *cert. denied,* 449 U.S. 1077 (1981). Nor, in the context of the instant case, was the government required to demonstrate that taxes in fact had not been paid or that the primary goal of the defendants was to evade taxes. *United States v. Shermetaro,* 625 F.2d 104, 109 (6th Cir.1980). Similarly, the government need not prove that the defendants understood the tax consequences of their activities. *United States v. Sanzo,* 673 F.2d 64, 69 (2d Cir.), *cert. denied,* 459 U.S. 858 (1982). The act of "laundering" money derived as profits from drug trafficking itself has been held to constitute impeding the IRS in its ability to collect taxes. *United States v. Browning,* 723 F.2d 1544, 1546 (11th Cir.1984).

Here, the indictment complied with the requirements of § 371. The seven page indictment set forth a substantial amount of factual detail. While it is true that the indictment did not state the name of a particular taxpayer, that was unnecessary. *United States v. Hajecate, supra,* 683 F.2d at 897. In any event, the indictment set forth sufficient factual detail to alert appellants that they were charged with conspiring to conceal the profits of the drug trafficking organization in which they participated. Moreover, although the law does not require it, the details of the indictment reasonably apprised appellants of the rele-

vant years of the alleged conspiracy. In short, the indictment provided even more than the "plain, concise" statement of the "essential facts" required by Fed.R.Crim.P. 7(c)(1). It furnished sufficient information to enable appellants to prepare their defenses.

We also hold that appellants' second claim—that the court should have granted their motions for bills of particulars—is without merit. The district courts have broad discretion in ruling upon motions for bills of particulars. *Will v. United States,* 389 U.S. 90, 98–99 (1967). In the instant case, where the indictment itself was more than adequate, we decline to hold that the district court abused its discretion in refusing to require the government to amplify it with a bill of particulars.

Turning to the third claim—that of O'Duggan—that the government failed to prove his knowledge of and participation in the conspiracy to impede the IRS, we hold it to be without merit. As we already have indicated, an agreement to launder money derived from narcotics trafficking constitutes an act of impeding the IRS in its collection of taxes. *United States v. Browning, supra,* 723 F.2d at 1546. In the instant case, the cumulative evidence clearly was sufficient to show that O'Duggan knew of the conspiracy to traffic in drugs and that he participated in money-laundering activities which had the effect of impeding the IRS in its collection of taxes.

First, the evidence showed that O'Duggan agreed to put Tarvers on his payroll and that this was done for Tarvers' tax purposes. This agreement was entered into about a year after Tarvers similarly had asked Richard Loring to pay him only a nominal salary and to give him an expensive car because, as Loring testified, "the IRS was on [Tarvers'] back" and he wanted to "beat the system."

Second, two witnesses testified that O'Duggan loaned Tarvers $50,000 to help Tarvers get started in cocaine trafficking. The evidence showed that Tarvers repaid O'Duggan out of the proceeds of drug sales.

Third, O'Duggan was intimately involved in the sales and purchases of parcels of real estate. In these transactions, Tarvers became the beneficial owner and truly interested party, while O'Duggan or Brenner, as trustees for the Brewster Realty Trust, became the holders of record. Specifically, when Tarvers purchased his former home at 324 Main Street from his wife in 1980, the deed stated the purchaser to be the West Brewster Realty Trust, with O'Duggan as trustee. It was Tarvers, however, who assumed the mortgages on the house and made payments to his wife. When the house later was refinanced, it was O'Duggan who submitted personal financial statements and deposited the checks drawn to the order of the bank.

O'Duggan also served as trustee of the Mark and Stephen Realty Trust, which was the purchaser of record stated on one of three deeds executed by Paul Aiken, who was the seller of the property at 28 Spring Street. One of the other deeds, which never was recorded, stated that Tarvers personally was the purchaser. Tax bills on the property were sent to O'Duggan but were paid by Tarvers.

Fourth, O'Duggan was implicated deeply in the sale of the 21 Columbus Avenue property. While the evidence establishes that Tarvers was the true seller in that transaction, it was O'Duggan who showed the property to the buyers; told the buyers he was the "beneficiary" of the Brewster Realty Trust; demanded that the buyers bring part of the purchase price in cash "in brown paper bags"; deposited a check (made payable to Brenner) for the balance of the purchase price in his own account; and agreed to understate in the deed the true purchase price.

There is other evidence that shows O'Duggan's knowledge of and participation in the conspiracy. This includes (1) O'Duggan's failure to file personal tax returns in 1979, 1981 or 1983; (2) O'Duggan's loan to Tarvers of an American Express card with a $5,000 limit; (3) O'Duggan's regular appearances at Universal Cosmetics, a company that sold only fifty cases of nail polish remover in two years; (4) O'Duggan's ex-

plicit questioning of Schaefer as to whether Schaefer became "nervous" about carrying cocaine on airplanes; and (5) Brenner's statement to the IRS that Brenner's agreement to act as trustee—just like O'Duggan —for the West Brewster and the Mark and Stephen Realty trusts was intended "probably to disguise the true ownership of the property" from the IRS.

While O'Duggan seeks to diminish the weight of this evidence, by either labeling it as mere hearsay or asserting that the government has drawn unsupportable inferences from the record, we find these claims to be unpersuasive. The statements O'Duggan characterizes as "hearsay" were admissions made by co-conspirators in furtherance of and during the course of the conspiracy. As such they presumptively were reliable and admissible under Fed.R. Evid. 801(d)(2)(E). Moreover, the limited inferences drawn from the facts were supported by the cumulative weight of the evidence. In short, ample evidence supported O'Duggan's conviction on Count VII.

We hold that Count VII stated an offense with sufficient specificity; that there was no need for a bill of particulars with respect to Count VII; and that there was sufficient evidence to establish O'Duggan's knowledge of and participation in the conspiracy.

### IV.

■ This brings us to Tarvers' claim that the court erred in sentencing him to special parole terms on Count I, which charged a violation of the CCE statute, 21 U.S.C. § 848, and on Counts III and IV, which charged substantive cocaine violations under 21 U.S.C. § 841. We agree that the court should not have imposed a special parole term on Count I, but we uphold the special parole terms imposed on Counts III and IV.

Tarvers cites *United States v. Grammatikos*, 633 F.2d 1013, 1025 (2d Cir.1980), which holds that under § 848 "special parole may not be imposed", *see also Bifulco v. United States*, 447 U.S. 381, 398–99 (1980) (special parole unavailable for sen-

tencing under conspiracy statute, 21 U.S.C. § 846). He then argues that we should vacate *all* his special parole terms, even though Counts III and IV charged violations of § 841, not § 848.

The government concedes that, even though *Bifulco* was concerned with a statute other than § 848, the reasoning of the Supreme Court in that case applies with equal force to a § 848 case. This is because the language of both statutes fails to incorporate any reference to special parole terms. We therefore are constrained to agree with the Second Circuit that special parole is unavailable in a § 848 case. The government correctly maintains, however, that § 841, the statute upon which Counts III and IV are based, explicitly provides that a court "shall" impose a special parole term "in addition to such term of imprisonment." 21 U.S.C. § 841(b)(1)(A) (1982). We therefore decline to vacate the special parole terms imposed under those counts.

We hold that the district court erred in imposing a special parole term under Count I, but that it properly imposed special parole terms under Counts III and IV. We remand Tarvers' case to the district court solely for the purpose of vacating the special parole term imposed under Count I.

### V.

Appellants raise a number of other claims of error, only three of which warrant brief mention.

■ (1) O'Duggan claims that two out-of-court statements made by Tarvers were admitted improperly under Fed.R.Evid. 801(d)(2)(E) which treats statements of co-conspirators as non-hearsay admissions. These statements concerned (1) the theft of O'Duggan's camper in 1979, and (2) a $50,-000 loan made by O'Duggan to Tarvers. O'Duggan argues that neither statement, as required by Rule 801(d)(2)(E), was made "in the course of" or "in furtherance of" the charged conspiracy.

The testimony concerning the camper was given by Henrie and Schaefer. Henrie testified that Tarvers told him that O'Duggan's camper had been stolen while being

driven to Massachusetts with a load of marijuana. Tarvers wanted Henrie to retrieve the camper in Florida, where it was parked in a parking lot, and to bring it to Massachusetts for repairs. Henrie was reluctant to approach the stolen vehicle because he "didn't know if the police were watching it or what." Tarvers told Henrie the circumstances of the theft and that O'Duggan had reported the theft on July 4, 1979. Henrie subsequently retrieved the camper.

O'Duggan's theory with respect to the camper is that the camper had nothing to do with the conspiracy charged. This, he claims, is because it related only to an "uncharged marijuana conspiracy" and was not "in furtherance of" *any* conspiracy, but was merely narrative. We disagree on both points. First, the facts simply do not bear out that there were two separate "marijuana" and "cocaine" conspiracies. On the contrary, the evidence showed that, beginning in January 1977, Tarvers began dealing in a variety of drugs, including marijuana, quaaludes and cocaine. By the time of their conversation in November 1979, Henrie and Tarvers had been dealing regularly in cocaine for almost a year.

Second, it also is clear that Tarvers' statements were in furtherance of the conspiracy—specifically that part of the conspiracy having to do with distributing cocaine. Not only was Henrie apprehensive about retrieving the camper for Tarvers in the first place, but also Tarvers had an interest in maintaining Henrie's trust in him so that he would continue assisting Tarvers generally in distributing cocaine. The explanation about the camper thus could have served to reassure Henrie, not only that he could safely retrieve the camper, but also that Tarvers would not subject him to any risk of being apprehended by the police.

The statement about the loan also was in furtherance of the conspiracy. As shown by Schaefer's testimony, Schaefer had wanted to use the $90,000 cash he and Tarvers had accumulated to purchase large quantities of cocaine. Tarvers, however, explained that he could not use all of the money in that way because he owed O'Duggan $50,000 that O'Duggan had lent him to enable him to "get started in the cocaine business." Although O'Duggan claims that this statement was mere narrative, we are convinced that it furthered the conspiracy. A disagreement between Schaefer and Tarvers over the fundamental question of how to use the proceeds of their drug sales could have had a potentially devastating effect on their enterprise. It thus was imperative for Tarvers to explain why he could not agree with Schaefer on this matter.

(2) O'Duggan also claims that it was error for the court to have considered these two out-of-court statements in making its determination as to whether a conspiracy existed and thus whether Count VII should go to the jury. He claims the court should have considered only independent evidence as to whether a conspiracy existed. The Supreme Court, however, in *Bourjaily v. United States*, 107 S.Ct. 2775, 2781 (1987), held that "there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." Nevertheless, O'Duggan claims (1) that, even under *Bourjaily*, there must be at least *some* independent evidence, and that there was no such evidence in the instant case; and (2) that *Bourjaily* did not address the issue of whether a court could consider a co-conspirator's statements when those statements were made, as O'Duggan claims occurred here, in the course of a prior, uncharged conspiracy. Neither of these arguments has merit. First, as we have already discussed in detail in Part III of this opinion, there was abundant independent evidence that established O'Duggan's knowledge of and participation in the conspiracy, and thus *Bourjaily's* requirement of "some" independent evidence is easily satisfied. Moreover, aside from the fact that we have already rejected O'Duggan's argument that there were two independent "marijuana" and "cocaine" conspiracies, we have recently upheld a conviction in which evidence of a prior, uncharged conspiracy was used to show

the knowledge and intent of the defendant with respect to a later conspiracy. *See United States v. Lau,* 828 F.2d 871, 874 (1st Cir.1987). In short, the trial court correctly included the out-of-court statements in its analysis of whether a conspiracy between O'Duggan and Tarvers, the declarant, existed.

(3) Finally, citing *Kotteakos v. United States,* 328 U.S. 750, 772 (1946), Brenner and Tarvers claim that, although the indictment charged a single conspiracy, there were several conspiracies and thus there was an impermissible variance. After careful review of the evidence, we hold that there was only one conspiracy, albeit a looseknit and large one. In any event, we are convinced that even if there had actually been more than one conspiracy, any resulting variance between the indictment and proof did not "'affect the substantial rights' of the accused", *Berger v. United States,* 295 U.S. 78, 82 (1935), and thus any possible error would have been harmless. *United States v. Glenn,* 828 F.2d 855, 858 (1st Cir.1987).

We have considered carefully all of appellants' claims of error and we hold that all are without merit.

### VI.

To summarize:

We hold that the district court correctly instructed the jury that it was not required to reach a unanimous agreement as to the identities of the five persons for whom Tarvers acted in a supervisory capacity; that Count VII stated an offense with sufficient specificity, that there was no need for a bill of particulars with respect to Count VII, and that there was sufficient evidence to establish O'Duggan's knowledge of and participation in the conspiracy; that the court erred in imposing a special parole term on Tarvers under Count I, and we therefore remand with directions to vacate the special parole term imposed under that count; that the court properly imposed special parole terms upon Tarvers under Counts III and IV; and that appellants' other claims of error are without merit.

Affirmed in part; reversed and remanded in part.