UNITED STATES of America, Appellee,

v.

Joaquin CAMBARA,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jose CAMBARA, Defendant, Appellant.

Nos. 88–2010, 88–2221.

United States Court of Appeals,
First Circuit.

Heard Jan. 11, 1990.

Decided May 2, 1990.

Robert D. Richman, Federal Defender Office, Boston, Mass., was on brief for defendant, appellant, Joaquin Cambara.

David Anderstrom, with whom Jeffrey A. Denner, Denner & Associates, Newton, Mass., and Michael Andrews, Boston, Mass., was on brief, for appellant, José Cambara.

Robert L. Ullmann, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for appellee.

Before BREYER, TORRUELLA and ALDRICH, Circuit Judges.

TORRUELLA, Circuit Judge.

Defendants appeal from convictions entered by the United States District Court for the District of Massachusetts for conspiracy to distribute cocaine in violation of 21 U.S.C. § 841 and § 846 and conspiracy to defraud the United States under 18

U.S.C. § 371. José Cambara argues that there was insufficient evidence to convict him for conspiracy to defraud the United States. Joaquín Cambara argues that the district court's failure to excuse a prospective juror for cause denied him a fair trial. We disagree with both appellants and affirm the district court.

### FACTS

At trial, the government presented its case in two phases: the cocaine conspiracy was first, followed by the tax evasion charge. Since the Cambara brothers appeal on different issues, we will address their appeals separately.

### 1. *José Cambara*

In 1982, José and his brother purchased a taxi company, Matty Cab, Inc., with a $11,000 down payment in cash. For each of the next three years, José reported at least $17,000 in self-earned gross receipts as a taxi driver for Matty Cab. José Cambara's accountant, Joseph Rodríguez, testified that he prepared José's tax returns from 1980 to 1984. Rodríguez stated that he saw José several times a week during those years, and often worked weekends at CCR Real Estate Trust, a business run by José. Rodríguez also testified that he had only once seen the defendant behind the wheel of a taxicab, and that the defendant had never shown him any records from a taxi business. A long-time friend of José, and former cab driver, who saw José almost daily in 1984 and who worked in the neighborhood where CCR was located, testified that he had never seen José driving a cab and that he had never heard José or anyone else say that José drove a cab.

In December 1984, José Cambara and his co-defendants, signed a declaration of trust for CCR Real Estate Trust. That same month, José Cambara and co-defendant Gerardo Regalado opened an account in the name of CCR. During the next nine months, Cambara and the other co-defendants deposited and withdrew about $750,-000 into and out of that account. The signature card of the account stated that the corporate purpose of CCR was property management. An analysis of the account by an IRS agent revealed that virtually none of the account's activity was used for that purpose: checks were drawn on the account to make real estate and automobile payments on José Cambara's own personal property, to make loans to fund José's other accounts and to provide him with over $250,000 in cash.

In the spring of 1985, José Cambara and Regalado obtained over a quarter-million dollars through a series of withdrawals, each of which was just under the $10,000 amount which must be reported to the U.S. Treasury Department.[1] Between March 15 and May 10, 1985, José Cambara made 26 cash withdrawals to himself, each in the amount of $9,500, for a total of $247,000. In April 1985, José Cambara used the same account to write three $9,500 checks to his stepdaughter on each of three consecutive days.

In September 1985, José Cambara and his co-defendants became aware of a federal investigation. Regalado cautioned José Cambara's wife about the IRS. Regalado and José divided at least $114,000 among themselves and other conspirators. Thereafter, José and Joaquín sold their taxi company.

José Cambara challenges his conviction of conspiracy to defraud the United States by impeding and impairing the Internal Revenue Service, alleging that the government failed to offer sufficient evidence to prove either the existence of a conspiracy or the purpose of the alleged conspiracy.

### 2. *Joaquín Cambara*

Joaquín Cambara challenges only the fairness of the jury selection process. The facts regarding his argument are as follows. At the *voir dire*, prospective jurors were asked about their previous involvement in any criminal process. Prospective

---

1. While the repeated withdrawals of amounts just under $10,000 were not unlawful at the time, *see United States v. Anzalone*, 766 F.2d 676 (1st Cir.1985), those withdrawals were evidence of the conspiracy to impede and impair the IRS.

146

juror Dorothy Balben told the court that she had two relatives who were involved in drug and robbery offenses, and that she felt that she was too emotional to sit in this case. The court questioned her about these emotions, determined that she would be impartial, and denied Joaquín Cambara's request that she be dismissed for cause. Joaquín then used a preemptory challenge to remove Balben. By the end of the *voir dire* Joaquín Cambara had exhausted all his preemptory challenges of which he had more than the usual number—twelve. Joaquín Cambara does not charge the jury with impartiality. Instead, he argues that, by denying his challenge of a juror for cause, the district court forced him to use a peremptory challenge to remove that juror, and that this constitutes a *per se* reversible error.

## DISCUSSION

### 1. *José Cambara's Sufficiency Challenge*

 We review a criminal conviction for sufficiency of the evidence in the light most favorable to the prosecution, to determine whether any rational trier of fact could have found the essential elements of crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Assessing the credibility of the witnesses, however, is the sole function of the jury. *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2149–2150, 57 L.Ed.2d 1 (1978). *See also United States v. Serrano*, 870 F.2d 1, 5 (1st Cir.1989). Under 18 U.S.C. § 371, to prove conspiracy, the government must prove (1) the agreement, (2) the unlawful objective of the agreement and (3) an overt act in furtherance of the conspiracy. *United States v. Giese*, 597 F.2d 1170, 1177 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). *See also United States v. Tarvers*, 833 F.2d 1068, 1075. A conspiracy to defraud the United States by obstructing and impeding the Internal Revenue Service in the collection of taxes is often referred to as a *Klein* conspiracy. *United States v. Klein*, 247 F.2d 908 (2d Cir.1957).

### a. The Agreement

José Cambara and his co-conspirators not only acted in concert, but also entered into written agreements that furthered the conspiracy. Both CCR Real Estate and Matty Cab, Inc. were joint ventures between Cambara and at least one co-defendant. Moreover, the declaration of trust for CCR was signed by Cambara and three other co-defendants. Additionally, the conspirators opened three separate bank accounts in the name of CCR, one of which was used to make a payment of $72,000 for jointly owned property and to withdraw over $250,000 over a two month period. Additional funds from the CCR accounts were used to make payments for real estate and cars used by José Cambara and his co-conspirators. Given these facts, we think it is reasonable to conclude that Matty Cab, Inc. was purchased by José and his brother to provide a seemingly legitimate explanation for the drug proceeds.

Furthermore, after the conspirators learned that they were under federal investigation, they divided their pooled resources. In a recorded conversation, José Cambara and another defendant discussed the distribution of at least $114,000. Thereafter, José and Joaquín sold Matty Cab. The conduct and circumstances of these actions indicates a common purpose sufficient to find an agreement to conspire. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Cincotta*, 689 F.2d 238, 241 (1st Cir.1982), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1984).

### b. The Common Unlawful Objective

The government proved that the defendant's involvement in "an agreement to launder money derived from narcotics trafficking[,] [which] constitutes an act of impeding the IRS in its collection of taxes." *United States v. Tarvers*, 833 F.2d 1068, 1076 (1st Cir.1987). The evidence showed that José and Regalado participated in the same cocaine distribution and money laundering schemes. DEA agents saw Regalado and José Cambara outside the offices of CCR engaging in activity consistent with

the distribution of drugs. Electronic surveillance inside the CCR Real Estate building, which was owned by Regalado and José Cambara, resulted in the recording of conversations about drug trafficking and money laundering. In one conversation Regalado told José Cambara's wife that the defendants would have to adjust their activities because of a federal drug investigation saying, "whoever they put in jail, if the feds get him, they won't let him go. Be it just for a gram ..." One week later, Regalado noted that another co-defendant "doesn't have even a kilo of that shit left."

Money laundering activity was proven by a preponderance of the evidence. That evidence showed use of accounts in the name of CCR, commingling of funds in these accounts, use of currency for the purchase of large assets and the structuring of transactions designed to evade U.S. Treasury Department reporting requirements. Regalado's concern about the IRS is clear from a recorded conversation in which he told Cambara's wife, "except for all the mischief I've been into I'm very legal in all my paperwork and in my income taxes ... But we're not all that way." Furthermore, testimony at trial from a cocaine customer revealed that José and his brother received at least $100,000 in cocaine sales during 1984 and early 1985 from that customer alone, but during this same time José reported his income as being derived solely from the taxi business.

### c. The Overt Act

The government also proved that José Cambara and his co-defendants, knowing that their funds had been derived from drug trafficking, agreed to create and use "front" companies, and to structure their financial transactions in order to evade reporting requirements. *Tarvers*, 833 F.2d at 1076; *United States v. Lizotte*, 856 F.2d 341, 342–343 (1st Cir.1988). Moreover, the government proved that José Cambara was a conspirator in drug trafficking activity

from which the laundered funds were derived, and that at least one of his co-conspirators (Regalado) expressed concern in a recorded conversation with Cambara's wife about an IRS investigation.

■ The conspiracy statute does not require that unlawful means be used to achieve the unlawful goal of the conspiracy. *United States v. Turkish*, 623 F.2d 769, 771 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *Tarvers*, 833 F.2d at 1075. Nor must the government prove that tax evasion was the sole motive, or even the primary motive, of the co-conspirators. "If a tax evasion motive plays any part in a scheme, the offense can be made out even though the scheme may have other purposes such as the concealment of other crimes." *United States v. Shermetaro*, 625 F.2d 104, 109 (6th Cir.1980); *see Tarvers*, 833 F.2d at 1075. Furthermore, the government need not prove that the defendants knew the tax consequences of their activities. *United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982); *Tarvers*, 833 F.2d at 1075.

Given that all the elements of conspiracy were proven and that precedent favors the government's position, we affirm the jury verdict with regard to José Cambara.

### 2. *Joaquín Cambara's Allegations*

■ Prospective juror Dorothy Balben's bias, or lack thereof, was immaterial because Joaquín Cambara had two additional peremptory challenges[2], one of which was used to excuse Balben. Joaquín does not charge that the jury that convicted him was not impartial. Instead, he argues that he was unfairly forced to expend a peremptory challenge, of which he had more than the amount required by law, and that this constitutes reversible error. Although it is true that restricting a defendant's use of the lawful number of peremptory challenges is reversible error if a challenge for cause is erroneously denied, *see*,

---

**2.** Under Fed.R.Crim.P. 24(b), the defendant or defendants in a criminal trial are entitled to a total of ten peremptory challenges. In *United States v. Cox*, 752 F.2d 741, 748 (1st Cir.1985), we held that in a three defendant case the defen-

dants had no right to more than ten peremptory challenges. The district court judge awarded the defendants in the case at bar two additional challenges, for a total of twelve.

*e.g., United States v. Rucker,* 557 F.2d 1046, 1048–1049 (4th Cir.1977), Joaquín Cambara cites no cases holding that the impairment of an additional peremptory challenge violates any rights of the defendant. As we see it, the district court recognized the possibility of close questions concerning prospective jurors and Joaquín benefitted from this recognition by receiving additional peremptory challenges. None of the prospective jurors who were challenged for cause by Joaquín Cambara sat on the jury, including Dorothy Balben. Regardless of whether Balben should have been excused for cause, the trial court's decision had no effect upon the fairness of the trial. The jury was impartial.

Moreover, the decision not to excuse Balben for cause was within the district court's power. Facts favoring the appellant include: that Balben's brother had previously been convicted of armed robbery, that her nephew was involved in a rape case and drugs, and that Balben explicitly stated that she was "too emotional to be impartial." Facts favoring the government include: that Balben offered the facts about her relatives at a sidebar, simply adding that these facts made her "too emotional;" that in her explanation she thought she was too emotional to be impartial in any case, criminal or civil, casting doubt on her having thought much about what she meant; that she said she would "try to make an honest judgment" and would not "harbor a grudge ... against one side or the other;" that the conviction against her brother was long ago; and that the nephew was a distant relation.

The district court judge saw Balben and knew in context the extent to which her words and demeanor reflected confusion between whether she felt "emotional" about the events concerning her relatives and whether these emotions would lead to bias in the case. It is the fundamental task of the district court judge to make this sort of distinction.

*Affirmed.*