**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**John F. PRICE and Clarence D. Brinson,
Defendants–Appellants.**

**Nos. 91–3606 and 91–3607.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1992.

Decided June 8, 1993.

Gillum Ferguson, Barry R. Elden, Asst. U.S. Attys., John J. Tharp, Jr., Office of the U.S. Atty., Crim. Receiving, Appellate Div. (argued), Chicago, IL, for plaintiff-appellee.

Matthew F. Kennelly, Margaret L. Paris, Robert M. Stephenson (argued), Cotsirilos, Stephenson, Tighe & Streicker, Bernard B. Nathan, Chicago, IL, for John F. Price, defendant-appellant.

Matthew F. Kennelly, Margaret L. Paris, Robert M. Stephenson (argued), Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL, for Clarence D. Brinson, defendant-appellant.

Before KANNE and ROVNER; Circuit Judges, and REYNOLDS, Senior District Judge.[1]

REYNOLDS, Senior District Judge.

Clarence D. Brinson ("Brinson") and John F. Price ("Price") were principal shareholders and officers of Vegetarian Health Society ("VHS"). After a twelve-day trial, both were found guilty by a jury on charges of conspiring to defraud the United States with respect to income taxes in violation of Title 18 United States Code § 371, and attempting to evade personal income taxes in violation of 26 U.S.C. § 7201. Brinson was also found guilty of making a false corporate income tax return in violation of 26 U.S.C. § 7206(1) and Price was found guilty of aiding and assisting in the making of false documents in violation of 26 U.S.C. § 7206(2). Both appeal their judgments of conviction. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## FACTS

VHS was a wholesale mail order business which sold vegetarian food products and literature produced by other manufacturers. When established in 1979, VHS had five or six employees, including a bookkeeper. VHS also retained an outside accountant, who created VHS's accounting system and prepared the company's financial statements and tax returns.

When a sale was made at VHS, the salesperson would prepare a purchase order. A copy of the purchase order was then sent to the bookkeeping department, where the sale was recorded in a sales journal. The accountant would then record the figures from the sales journal in VHS's general ledger, from which financial statements were prepared, and review bank statements to reconcile the money amounts. The accountant received bank statements for approximately five corporate bank accounts, which he used in preparing VHS's financial statements and tax returns. In 1979, sales totaled almost $76,000.

In 1982, VHS hired Gerry McCarty, who became sales manager. In that year, sales reached $1.8 million. Brinson and Price claim that McCarty (who died in 1987) exercised almost exclusive control over VHS's finances, and basically ran the business. McCarty was fired in 1985. Brinson and Price allege that the tremendous sales increase in 1982 created havoc within VHS's accounting system. They concede that sales went unreported on VHS's tax returns in 1982–1985, and that they received money from VHS which was not reported on their personal tax returns.

VHS's accountant was unaware of additional VHS bank accounts, and a second sales journal for March 1982. Brinson and Price did not disclose the existence of the additional accounts during the IRS investigation. Many of the sales invoices provided by VHS to the IRS were forged or issued to nonexistent companies. Account numbers on checks which were deposited into one of Brinson's accounts were altered by changing "3" to "8." Some checks also had false notations indicating their purpose.

1. The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

## ANALYSIS

The issues presented by Brinson and Price are whether the district court properly limited their expert's testimony and whether the district court properly instructed the jury regarding their intent to defraud the government.

### Expert Testimony

 In general, a district court has broad discretion in determining whether evidence should be admitted or excluded. *United States v. Saunders,* 973 F.2d 1354, 1358 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993). In particular, a district court has broad discretion in determining whether to exclude expert witness testimony. *United States v. Larkin,* 978 F.2d 964, 971 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993); *see also* Fed.R.Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise"). We therefore will reverse the district court's ruling which limited the expert's testimony only if it abused its discretion. *Id.*

Brinson and Price maintain that their expert, Ira Edelson ("Edelson"), a certified public accountant and financial advisor, should have been allowed to testify that VHS's finances were in a state of confusion; that because costs of sales [2] and development were under-reported, VHS had no tax liability; and that defendants had no personal tax liability, i.e. unreported money from VHS was not "income," but rather was non-taxable reimbursement for expenditures made on VHS's behalf. The district court excluded a portion of Edelson's testimony as irrelevant, too general, and likely to confuse the jury. Brinson and Price argue that the district court's limitation on Edelson's testimony precluded them from presenting a defense to the government's allegations, in essence, a defense that any misreporting was not willful.

In examining the trial transcript, we find that Edelson was allowed to testify to the jury that in his opinion, (1) VHS's accounting system had significant errors and therefore did not properly record expenditures made on VHS's behalf; (2) the accounting system was somewhat complicated; (3) there were insufficient personnel to handle VHS finances, and VHS accounting personnel were inept; (4) sales entries were haphazardly made; (5) VHS employees did not check proper documentation before writing checks and making disbursements; (6) VHS's accountant did not reconcile accounts receivable with the general ledger, even though he knew there was a discrepancy between the two; (7) the "undisclosed" bank accounts, except for one, were disclosed in some form in the sales journal; and (8) the IRS analysis was meaningless because it did not consider the inadequacies of VHS's accounting system and the nature of VHS's transactions.

Edelson testified during defendants' offer of proof that when he calculated the ratio of VHS's unreported gross receipts [3] to VHS's reported cost of sales, the ratio was significantly higher when compared with industry standards. Edelson testified that it therefore follows that VHS had unreported cost of sales. Edelson also testified that there was no indication in VHS's books that it directly paid for costs not reflected in its financial statements, which could only have been paid for by an outside agency, and the only disbursements unaccounted for were to Brinson and Price.

The government brought out the following facts during defendants' offer of proof which relate to the credibility of Edelson's conclusions: the statistics utilized by Edelson related to manufacturers, not a mail order business; Edelson did not account for nonbakery products such as literature; Edelson found no evidence that specific expenditures by Brinson or VHS went to particular VHS purposes; Edelson was not aware that certain payments were allegedly supported by fraudulent invoices and check notations; and

---

**2.** Cost of sales are costs directly related to the sale of a product, such as materials, labor and overhead.

**3.** Edelson used VHS's unreported gross receipts as determined by the IRS.

Edelson did not know VHS's correct cost of sales figures. The government additionally elicited on cross-examination in front of the jury that Edelson did not know VHS's gross receipts; Edelson did not review all of VHS's checks; and if a company keeps two sets of sales journals and only one set is given to the accountant, the general ledger will be wrong and the gross receipts figure on the corporate tax return will be incorrect.

■ We find that in reviewing Edelson's testimony, he did testify to the jury that VHS's accounting system had many problems. With respect to VHS's tax liability (which was not an issue before the jury), the pages defendants cite in the transcript do not support their proposition that VHS had no tax liability, and in reviewing Edelson's entire testimony, we likewise find no basis for this argument.

Brinson and Price argue that they were prevented from offering what constituted their entire defense with respect to the allegation of personal income tax evasion. Brinson and Price were not, however, precluded from refuting the government's specific allegations of fraudulent invoices and checks, or from offering specific explanations for disbursements they made for VHS. Edelson was not capable of addressing the reasons for the "reimbursements" to defendants. We note that the fact that VHS's finances were in disarray does not negate the government's allegations that Brinson and Price willfully defrauded the government and skimmed money from VHS for their personal use, as defendants would argue.

We conclude that the district court did not abuse its discretion when it imposed limitations on Edelson's testimony.

*Jury Instructions*

■ The district court instructed the jury that "[a]s used in the instructions for Count 1 [conspiring to defraud the United States], the phrase 'intended to defraud' means that the acts charged in Count 1 were done knowingly, with the intent to deceive the United States Government." Defendants argue that an additional phrase should have been included to instruct that the acts were done "in

order to cause a monetary loss to the United States or a financial gain to the defendant."

■ A trial court is given substantial discretion in formulating jury instructions. *United States v. Olson*, 978 F.2d 1472, 1477 (7th Cir.1992). Defendants cite no authority which requires that a jury be instructed as they propose. The government cites cases from other circuits which do not include such an element to prove "intent to defraud." *See United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir.1989); *United States v. Tarvers*, 833 F.2d 1068, 1075 (1st Cir.1987); *United States v. Southland Corp.*, 760 F.2d 1366, 1382 (2d Cir.), *cert. denied*, 474 U.S. 825, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985); *United States v. Puerto*, 730 F.2d 627, 630 (11th Cir.), *cert. denied*, 469 U.S. 847, 105 S.Ct. 162, 83 L.Ed.2d 98 (1984). Defendants do not respond to the government's arguments in their reply brief, but merely state in a footnote that they "rely on their opening brief regarding the jury instruction issue raised on appeal." We conclude that the district court did not err when instructing the jury on intent to defraud.

For the foregoing reasons, the convictions of Brinson and Price are AFFIRMED.

ROVNER, Circuit Judge, concurring.

I join the court's opinion. However, I wish to offer a few additional thoughts about the limitation of Edelson's testimony, a question that the district court described as "very close." (R. 145, Nov. 25, 1991 Tr. at 7; *see also id.* at 5.)[1]

I agree that the district court did not abuse its discretion when it barred Edelson from opining that VHS must have incurred substantial unreported costs. This testimony might have lent some support to the theory that Brinson and Price were not skimming undisclosed corporate income but instead merely were reimbursing themselves for undocumented costs that they had covered personally. Like my brothers, however, I am convinced that Edelson's hypothesis was not sufficiently grounded in the particular facts of this case to be admissible.

1. All transcript cites that follow are to the trial transcript.

Had the government premised its case on the simple hypothesis that because the company's reported receipts were low compared to other firms in the industry, VHS must have earned additional income that was funneled into defendants' pockets, fair play might have required an opportunity for the defense to respond in kind. But the government's case did not rest on such speculation. The government documented large sums that VHS took in but did not report during the relevant tax years: $821,160.72 in 1982, $760,020.72 in 1983, $421,717.07 in 1984, and $781,361.22 in 1985. (*See* Tr. at 1272, 1280, 1282, 1285.) The government also identified each payment that Brinson and Price had received in these years that it deemed taxable income as opposed to reimbursement for costs incurred on behalf of VHS. These were not paltry sums either: by the IRS' calculation, Brinson had received undisclosed income of $567,972.90 in 1983, $268,855.22 in 1984, and $157,736.75 in 1985 (Tr. at 825–26; Gov. Ex. Griffin 2, App. B), whereas Price had received unreported income of $228,-752.00 in 1983, $205,917.94 in 1984, and $138,-598.09 in 1985 (Tr. at 864; Gov. Ex. Griffin 3, App. C).

Notably, the government did not attempt to prove that *all* unreported payments to Brinson and Price amounted to taxable income, but focused only on payments received under circumstances suggesting that they were income rather than reimbursement. (*See* Tr. at 791–92, 801, 822, 823–24, 829.)[2] For example, a number of the payments that the government deemed income to Brinson were payments that he had attempted to disguise as reimbursements with falsified invoices and canceled checks. (*See* Gov. Ex. Griffin 2, Schedule 15; Tr. at 796–801.) The government also counted as taxable income payments associated with defendants' purely personal expenses, such as the purchase of limousines, boats, or work done on a defendant's private residence (*e.g.*, Tr. at 806, 810,

811, 832–33, 838, 844, 855–56, 856–59), as well as payments deposited into or negotiated through defendants' personal accounts (Tr. at 804, 808–09, 825, 828–29, 834, 835–36, 838–44.)[3] Finally, many of the payments deemed income to Price took the form of cashier's checks payable to Price that Brinson had purchased with funds drawn, directly or indirectly, from various VHS accounts. (Tr. at 831–64.)

Given the specificity with which the government documented the sums that both VHS and defendants had received, the excluded portion of Edelson's testimony had only marginal probative value. I do not mean to suggest that Edelson was required to show that the government had mischaracterized a *particular* payment as taxable income. (*See* ante at 5–6; Tr. at 1325, 1433, 1434.) After all, the defendants premised their case on the notion that VHS' records were in such disarray that many costs simply were not documented. That theory suggests that Edelson would have been hard pressed to demonstrate that a given payment to defendants constituted reimbursement for an undocumented company expense. But the flaw in Edelson's opinion was much deeper, for his theory piled inference upon inference: based upon statistical data that was of questionable relevance to VHS, he hypothesized that VHS must have incurred unreported costs and that those costs must in turn have been paid by Brinson and Price. Without any basis in the facts of the case, Edelson's testimony was mere speculation. Had Edelson been able to identify one or more kinds of expenses that VHS *in fact* incurred but did not record in its books, his opinion might have had a firmer basis in the evidence.[4] But given the substantial methodological flaws the court has already identified (not the least of which being Edelson's use of data for producers of baked goods rather than mail order distributors of these and other types of

---

2. The district court itself described the government's analysis as painstaking. (Tr. at 1452.)

3. Of course, the government considered defendants' reported compensation and amounts received in payment of actual loans to the company in calculating their unreported income. (*See* Tr. at 1236–39, 1253.)

4. Of course, even with this kind of factual support, Edelson's reasoning still would have required the inference that if there were unreported costs, Brinson and Price must have paid them.

products), Edelson's reliance upon nothing more than industry data to support his hypothesis proved fatal to his testimony.

Moreover, Judge Hart carefully exercised his discretion here. Before limiting Edelson's testimony, he listened to Edelson's analysis on *voir dire* and entertained argument from both sides as to its propriety. Given the nature of the government's proof and the shortcomings in Edelson's methodology, I agree that the district judge was well within his discretion in excluding Edelson's proffered analysis.

Even if Edelson's opinion was wrongfully excluded, the error was surely harmless. The record contains overwhelming evidence against Brinson and Price. As I have already noted, the government meticulously established both that VHS receipts had been grossly understated on the corporate tax returns (*see, e.g.*, Tr. at 1272, 1280, 1282, 1285) and that Brinson and Price had received large sums of money from VHS that were not disclosed on their personal tax returns—sums that dwarfed their reported income (*see* Gov. Ex. Griffith 2, 3; *see also, e.g.*, Tr. at 825–26, 864, 1245, 1249, 1255–56, 1257). The evidence revealed that much of this money passed through VHS-affiliated accounts that were not reflected on the company's books and that in a number of instances were closed shortly after defendants were apprised of the government's investigation. (*See* Tr. at 646–48, 656–60, 680–93, 1140–42.)

At the same time, the evidence belied each of the explanations defendants offered for the unreported payments. More than half a dozen individuals testified that the invoices and checks Brinson had submitted as proof of his cash outlays on behalf of VHS reflected fictional purchases of goods and services. One after another, these witnesses testified that the invoices appeared to have been doctored and that their own company records did not reflect the transactions indicated. (Tr. at 242–48, 259–60, 274–76, 281–89, 346–47, 365–75, 393–94, 408–11, 429, 493–97, 554–59, 574–76, 579–80; *see also id.* at 733–35.)[5] Indeed, more than one testified that his or her firm did not even sell the types of goods or services reflected on the invoices. (Tr. at 347, 355, 409–10, 429–30, 557–58.) All testified that it was not their firms' practice to accept large cash payments, which contradicted defendants' representation that they customarily paid cash because their vendors preferred it. (*Compare* Tr. at 663, 664–65, 668, 994, 999 *with id.* at 236–37, 285–86, 348, 369–70, 394, 410–12, 430–32, 496, 560.)[6] In addition, the evidence disclosed that Price had received hundreds of thousands of dollars from corporate accounts through Brinson from 1983 through 1985. This contradicted Price's claim that Brinson had bought him out of business in 1982 for $5,000 and that he did not even work for the company for more than a year between 1983 and 1984. (*See* Tr. at 52, 643, 651–52, 1149, 1571.) Although Price contended that the payments were reimbursement for the $30,000 he had loaned to the corporation at its inception (*see* Tr. at 53, 1580–82), he ultimately received well over half a million dollars in unreported disbursements. (*See* Gov. Ex. Griffith 3, App. C.)

In short, although there is no dispute that VHS' bookkeeping was exceedingly deficient (Tr. at 155, 198, 1396), the evidence revealed not just an inadvertent failure to report the sums paid to Brinson and Price, but a purposeful effort to disguise the nature of those payments. For that reason, I am certain that the verdicts would have been the same even if the jury had been allowed to hear Edelson's opinion. (*See* Tr. at 1445, 1446–47, 1471–72.)

---

5. Some of the businesses reflected on the invoices and checks did not even appear to exist. (*See* Tr. at 705–08, 735–41.)

6. Defendants asserted that McCarty typically used cash to purchase goods and services for VHS. (*See* Tr. at 668, 994, 999, 1001–02, 1027–28, 1079, 1565–66.) Although a number of the invoices that Brinson supplied to the IRS had McCarty's name on them, it was consistently misspelled "McCarthy." (Tr. at 668–70.) Moreover, when shown a copy of an invoice that McCarty purportedly had initialled, his widow observed not only that his name was misspelled, but also that the initials were not in his handwriting. (Tr. at 514–15.)