United States Court of Appeals
For the First Circuit

No. 93-1608

UNITED STATES,

Appellee,

v.

EUSEBIO ESCOBAR-DE JESUS,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Prez-Gimnez, U.S. District Judge]

Before

Boudin, Circuit Judge,
Reavley, Senior Circuit Judge,*
and Lipez, Circuit Judge.

Rachel Brill for appellant.
Thomas M. Gannon, attorney, Department of Justice, with whom
Guillermo Gil, United States Attorney, and Jorge E. Vega-Pacheco,
Assistant United States Attorney, were on brief for appellee.

August 2, 1999

*Of the Fifth Circuit, sitting by designation.
LIPEZ, Circuit Judge. This case involves a large drug
trafficking organization that imported cocaine from Colombia and
distributed it in Puerto Rico and New York from 1986 until 1990. 
In April 1991, as the climax of a lengthy investigation, a federal
grand jury returned a thirty-four count superseding indictment
charging defendant-appellant Eusebio Escobar-de Jess ("Escobar")
and seventeen other individuals not parties to this appeal with
various drug-related offenses. In April 1993, a jury convicted
Escobar of sixteen drug, assault, and weapons-related counts,
including Count 1, engaging in a continuing criminal enterprise in
violation of 21 U.S.C. 848(a) & (c), and Count 12, causing an
intentional killing while engaged in a continuing criminal
enterprise in violation of 21 U.S.C. 848(e). This appeal
followed, the disposition of which was deferred pending the Supreme
Court's decision in United States v. Richardson, 119 S. Ct. 1717
(1999), on juror unanimity requirements applicable to a continuing
criminal enterprise charge. After careful consideration of the
record and Escobar's many arguments on appeal, we affirm all of the
convictions. 
I. Background
We recite the facts in the light most favorable to the
verdicts, consistent with support in the record. See United States
v. Rodrguez, 162 F.3d 135, 140 (1st Cir. 1998). We summarize
below the facts presented during the trial, providing additional
details as they become relevant to the discussion.
The March 26, 1986 Lajas Incident
Largely through the testimony of cooperating co-defendant
Edwin Soto-Osorio ("Soto"), the government established that on 
March 26, 1986, Escobar directed Soto and co-defendants Florentino
Rivera-Mojica ("Rivera") and Antonio Santos-Caraballo ("Santos") to
accompany him to a dirt road in the middle of a sugar cane field in
Lajas to meet a plane containing cocaine from Colombia. To
demarcate the makeshift landing strip, the men placed white lights
along the beginning of the road and yellow lights along the end of
the road. The lights were powered by a car battery. After the
plane crash-landed, the four men and several other individuals
associated with Escobar retrieved much of the plane's drug cargo
and transported it to nearby Loza. Following the departure of
Escobar and his associates, law enforcement officers arrived at the
scene of the crash and discovered cocaine in the plane. 
The April 14, 1986 Shooting of Customs Agents
On April 14, 1986, co-defendant Eric Flores-Rivera
("Flores") drove a yellow truck to the Isla Grande airport and
obtained more than one hundred gallons of aviation gasoline. 
Surveilling agents then observed Flores drive the yellow truck into
the Potrero Cuevas Farm ("the farm") near Carolina. An agent also
observed a blue truck driven by co-defendant Andrs Morales-Cruz
("Morales") enter the farm. Waiting outside the farm, agents heard
a plane flying overhead. Shortly thereafter, agents observed the
yellow truck, a white van, and a blue truck driven by Escobar and
carrying six passengers (four dressed in camouflage) leave the
farm. Two of the surveilling agents followed the white van to a
nearby town, where the van suddenly reversed direction and its
occupants opened fire on the agents. Both agents were seriously
wounded.
In the days following the shootings, agents searched the
vicinity of the farm and discovered a clandestine landing strip
made of dirt. They also found, inter alia, twenty heavy-duty lamps
that had been purchased by Escobar, batteries, and a string that
had been stretched along the makeshift landing strip. Escobar's
fingerprints were on one of the lamps, and more than sixty gallons
of the aviation fuel which had been brought to the farm by Flores
were gone. Agents found the white van used in the shooting in the
Loza River on April 16. 
The November 1989 Intercepted Cocaine Shipment
In 1989 federal authorities began an investigation of
Escobar that included court-ordered electronic surveillance and the
use of a confidential informant named William Cedrs. In order to
infiltrate Escobar's organization, Cedrs began managing a Loza
grocery store and bakery, and, through his acquaintances with co-
defendants Rivera and Hctor Ros-Velsquez ("Ros"), was
introduced to Escobar. Through his infiltration of Escobar's
organization, Cedrs learned that Escobar directed an organization
of at least fourteen members. 
In early November 1989, Escobar and Rivera made plans to
deliver a shipment of cocaine from Puerto Rico to New York on a
commercial airlines flight. Cedrs expressed interest in
participating in the delivery, and Escobar agreed. On November 21,
co-defendant Fernando Faccio-Laboy ("Faccio") delivered eighty
kilograms of cocaine to Escobar, who in turn delivered the cocaine
to Cedrs in five suitcases. Rivera and Cedrs placed official
inspection seals from the United States Department of Agriculture
on the five suitcases and presented them at the check-in counter at
the airport. Rivera and Cedrs boarded the flight, but the
suitcases were seized upon arrival in New York by federal
authorities. Rivera called Escobar in Puerto Rico to report the
situation. Escobar later met with Faccio and a representative of
the Ochoa family, part of Colombia's Medelln cartel, to discuss
the lost cocaine. 
December 1989: Planning for Future Importations
In December 1989 Escobar began to plan additional
importations of cocaine from Colombia to Puerto Rico. On December
9 and December 13, Escobar and several subordinates traveled to
Vieques, Puerto Rico, to inspect potential sites for clandestine
airstrips to use in importing approximately 1,500 kilograms of
cocaine from the Medelln and Cali cartels in Colombia. On or
about December 20, Escobar and his subordinates also discussed the
possibility of using a plane to drop the cocaine into the ocean
near Gunica, where it would be picked up by speedboats directed by
co-defendants Soto and Santos. During the month of December 1989
Escobar also discussed cocaine importation with Jos Alberto Ochoa-
Vasco ("Ochoa"), a representative of the Medelln cartel. 
The Murder of Martn Matos-Cruz
According to Cedrs's testimony, in December 1989 Escobar
asked him to kill Martn Matos-Cruz ("Matos"), who was the third-
ranking member of Escobar's organization and had fallen out of
favor with Escobar. On January 2, 1990, however, Escobar told
Cedrs that he had found another person, co-defendant Michael Cruz-
Gonzlez ("Cruz"), to kill Matos. The same day, Escobar and Cruz
traveled to Carolina to identify Matos's residence, and on January
3, according to Cedrs's testimony, Cruz shot and killed Matos
outside Matos's residence. On January 5, at Escobar's request,
Cedrs gave Cruz $1,500 as a partial payment for the murder. 
The March 1990 Attempted Importation
Throughout January and February 1990, Escobar and his
confederates continued to plan drug importations, meeting at least
fifteen times to discuss the logistics of the effort. Between
March 5 and March 13, Escobar was in repeated telephone contact
with several individuals, including Soto, regarding an anticipated
cocaine delivery. On March 13, Escobar and his men attempted to
import 320 kilograms of cocaine by air, but the flight was
intercepted by Coast Guard and Customs Service aircraft, causing it
to break off and return to Colombia. 
Following this aborted importation, Escobar and his
confederates continued to meet during March and April to discuss
other ways to successfully import cocaine to Puerto Rico. On April
2, Mesa informed Escobar by telephone that a shipment of cocaine
was ready for delivery and that he should arrange to receive it. 
Shortly thereafter, however, Escobar entered a drug rehabilitation
program in order to avoid revocation of his parole. Cedrs
replaced him in meetings with representatives of the Medelln and
Cali cartels, and kept Escobar informed of developments. On April
8, Cedrs and Flores met Escobar at the drug rehabilitation
facility to discuss arrangements for the importation. Before the
importation could be executed, however, Escobar was arrested.
II. The Jury Instructions
A. Continuing Criminal Enterprise
Section 848, often referred to as the "kingpin" statute,
makes it a crime to engage in a "continuing criminal enterprise." 
The statute provides:
[A] person is engaged in a continuing criminal
enterprise if 

(1) he violates any provision of [the federal
drug laws, i.e.,] this subchapter or
subchapter II of this chapter the punishment
for which is a felony, and

(2) such violation is part of a continuing
series of violations of [the federal drug
laws, i.e.,] this subchapter or subchapter II
of this chapter 

(A) which are undertaken by such person in
concert with five or more other persons
with respect to whom such person occupies
a position of organizer [or supervisor or
manager] and 

(B) from which such person obtains
substantial income or resources.

21 U.S.C. 848(c). In this case, the jury convicted Escobar of
Count 1, charging that he had engaged in a continuing criminal
enterprise ("CCE") from on or about April 1986 until the date the
indictment was filed, in violation of 21 U.S.C. 848(a) & (c); and
of Count 12, charging that he had caused the killing of Martn
Matos-Cruz while engaged in the CCE, in violation of 21 U.S.C. 
848(e)(1)(A). 
On appeal Escobar argues that the district court erred in
failing to grant his proposal to instruct the jurors that, in order
to convict under section 848, they must agree unanimously on which
underlying violations of the ten alleged constituted the three
related violations necessary to establish a "continuing series."
See United States v. Chagra, 653 F.2d 26, 27-28 (1st Cir. 1981)
(noting that other courts have required at least three violations
for a "continuing series"). Although recent Supreme Court
authority confirms that the district court did err, we conclude
that the error in this case was harmless.
In United States v. Richardson, 119 S. Ct. 1707 (1999),
the Supreme Court addressed the question whether a jury must agree
unanimously about which specific predicate violations make up the
"continuing series of violations." That question turned on whether 
the existence of a "series" is itself a single element, as to which
the violations are merely underlying "brute facts" not requiring
juror unanimity, or whether the individual violations in that
series are themselves elements of the offense. See id. at 1710. 
Under the former interpretation, jurors, in order to find that a
defendant committed a "continuing series of violations" within the
meaning of section 848, would need to agree unanimously only that
the defendant had engaged in a continuing series of at least three
violations; individual jurors would be free to find that continuing
series based on the same, overlapping, or entirely different
violations. See id. Thus, under this theory, a defendant could be
convicted of the CCE offense even if jurors could not agree
unanimously that the defendant committed any of the alleged
violations. For example, half of the jurors might find that
offenses A, B, and C, but no others, were committed and constituted
a continuing series, and the other half of the jurors might find
that offenses D, E, and F, but no others, were committed and
constituted a continuing series. 
Relying on considerations of language, tradition, and
potential unfairness, the Supreme Court rejected the notion that
the "violations" referred to in section 848 are simply fungible
means of satisfying the "series" element of section 848. See id.
at 1709-13. Rather, the Court held that those "violations" are
themselves elements of the offense, meaning that jury unanimity in
respect to each individual violation is necessary. See id. 
Accordingly, in cases where the government introduces evidence that
the defendant has committed more underlying drug crimes than
legally necessary to make up a "series," Richardson requires that
they agree unanimously about which crimes make up the continuing
series. See id. at 1709.
In light of Richardson, the government concedes that the
district court erred by failing to instruct the jurors that the
"violations" are themselves elements of the CCE offense and that
they therefore must agree unanimously about which three (or more)
drug crimes the defendant committed. The government argues,
however, that the court's error was harmless because the jury
separately convicted Escobar of Counts 10, 19, 20, 23, 24, and 33,
which were six of the ten predicate offenses alleged to constitute
the series. See supra note 6. Thus, the government observes, the
jurors must have unanimously agreed that Escobar committed six of
the alleged violations, which was more than enough to constitute a
"series." See Chagra, 653 F.2d at 27-28. 
We have previously recognized that some uncertainty
exists about whether a jury instruction that misdefines or omits an
element of the offense charged is susceptible to harmless error
review. See United States v. Marder, 48 F.3d 564, 573 (1st Cir.
1995); United States v. Whiting, 28 F.3d 1296, 1309, 1309 n.12 (1st
Cir. 1994) (collecting cases). The Supreme Court recently
addressed this question in Neder v. United States, 119 S. Ct. 1827
(1999), in which the Court ruled that the trial court's omission
during its jury instructions of an essential element of the offense
charged (namely, the materiality element of a tax offense) is
subject to harmless error review. See id. at 1833-36. In Neder,
the Court observed that an error is "structural," and therefore not
subject to harmless error review, only in a "'very limited class of
cases,'" id. at 1833 (quoting Johnson v. United States, 520 U.S.
461, 468 (1997)), and that it had on many occasions applied
harmless error analysis to cases involving improper instructions on
a single element of the offense, see id. at 1834 (citing Yates v.
Evatt, 500 U.S. 391 (1991) (mandatory rebuttable presumption);
Carella v. California, 491 U.S. 263 (1989) (per curiam) (mandatory
conclusive presumption); Pope v. Illinois, 481 U.S. 497 (1987)
(misstatement of element); Rose v. Clark, 478 U.S. 570 (1986)
(mandatory presumption)). Such omissions, the Court stated,
"differ[] markedly from the constitutional violations we have found
to defy harmless-error review," such as the complete denial of
counsel or trial before a biased judge. Id. at 1833. Accordingly,
where a court omits or misdescribes an essential element of the
offense, as happened here by the court's failure to instruct the
jury that the "violations" were themselves elements of the CCE
crime and that they therefore must agree unanimously which
violations make up the "continuing series," the conviction must
nonetheless be affirmed if the reviewing court can conclude beyond
a reasonable doubt that a rational jury would have found the
defendant guilty absent the error. See id. at 1838.
In this case, the jury's decision to convict Escobar on
Counts 10, 19, 20, 23, 24, and 33 which were alleged to be
predicate violations supporting the CCE count necessarily
establishes that the jurors agreed unanimously that he was guilty
of those offenses. This decision ensures that the concern at the
core of the Richardson decision namely, that jurors might convict
a defendant of a CCE on the basis of violations for which there was
non-unanimity is not present. The guilty verdicts on Counts 10,
19, 20, 23, 24, and 33 are tantamount to the jury having found 
that he committed each of these violations for the purposes of the
CCE count. 
That is not the end of the matter, however. Section 848
also requires that jurors agree that the "series" of violations be
"continuing" in nature that is, that they be related to each
other in some way. See United States v. Edmonds, 80 F.3d 810, 814
(3d Cir. 1996) (citing United States v. Jones, 801 F.2d 304, 307
(8th Cir. 1986); United States v. Baker, 905 F.2d 1100, 1104 (7th
Cir. 1990)). Although the guilty verdicts on Counts 10, 19, 20,
23, 24, and 33 erase as a matter of logic any concern that the jury
did not agree that Escobar actually committed the offenses making
up the series, we can affirm the CCE convictions only if we can
conclude beyond a reasonable doubt that the jury, had it been
properly instructed, would have found that at least three of those
counts were related to each other. 
The evidence introduced to support the separate
convictions on those counts also establishes inescapably their
relatedness. The counts involved Escobar's ongoing and persistent
efforts to import and distribute cocaine over a finite period of
time in late 1989 and early 1990. After the failed importation
attempt in late 1989 (Count 10), Escobar re-grouped and tried again
in March 1990 (Counts 19, 20, 23, and 24). After failing once
again in March, he began planning for another attempt in April 1990
(Count 33). The relatedness of the counts is demonstrated by their
proximity in time and identity of purpose, and we conclude beyond
a reasonable doubt that the jury, had it been properly instructed,
would have found that the counts were "continuing" in nature. See
id. at 825; United States v. King, 169 F.3d 1035, 1041 (6th Cir.
1989). Accordingly, we conclude that the court's refusal to
instruct the jurors that they must agree unanimously about which
violations make up the "continuing series" of violations, within
the meaning of section 848(c)(2), was harmless. 
B. The Telephone Facilitation Counts
Escobar also argues that the district court erred in its
instructions to the jury on three telephone facilitation counts,
which charged him with using a telephone in facilitating the
importation of cocaine in violation of 21 U.S.C. 843(b). 
Specifically, Escobar contends that the district court should have
expressly instructed the jury that in order to convict under
section 843(b), it had to find that the underlying drug offenses
alleged to have been facilitated by his telephone use namely, the
importations were actually committed. Because Escobar did not
object to the district court's instructions during the trial and
raises this issue for the first time on appeal, we review only for
plain error. See Fed. R. Crim. P. 52(b); Johnson v. United States,
520 U.S. 461, 466-67 (1997); United States v. Olano, 507 U.S. 725,
732 (1993). 
The federal courts have uniformly held that, to obtain a
conviction on a charge of telephone facilitation pursuant to
section 843, the government must prove commission of the underlying
offense. See United States v. Iennaco, 893 F.2d 394, 396-97 (D.C.
Cir. 1990); United States v. Dotson, 895 F.2d 263, 264 (6th Cir.
1990)(citing United States v. McGhee, 854 F.2d 905, 908 (6th Cir.
1988)); United States v. Johnstone, 856 F.2d 539, 543 (3d Cir.
1988); United States v. Mims, 812 F.2d 1068, 1077 (8th Cir. 1987);
United States v. Russo, 796 F.2d 1443, 1463-64 (11th Cir. 1986);
United States v. Rey, 641 F.2d 222, 224 n.6 (5th Cir. 1981); United
States v. Webster, 639 F.2d 174, 189 (4th Cir. 1981); United States
v. Watson, 594 F.2d 1330, 1342-43 (10th Cir. 1979); United States
v. Steinberg, 525 F.2d 1126, 1133-34 (2d Cir. 1975). But Escobar's
challenge, though predicated on section 843(b)'s requirement that
the underlying drug offense have been committed, is more specific: 
he assigns error to the district court's failure to expressly
charge the jury regarding this requirement (over and above
recitation of the statutory language). On this narrower
instructional point, there is little authority. Indeed, we have
discovered only one case that has addressed whether a district
court must instruct the jury in the manner urged by Escobar. See
Dotson, 895 F.2d at 263 (holding that the district court should
have expressly charged the jury that it had to find underlying
crimes were actually committed, but concluding that the court's
error was harmless). 
Although the language of section 843(b) itself arguably
conveys without any need for elaboration the requirement of a jury
finding that the underlying drug offense was committed, we agree
that an instruction would have clarified any potential ambiguity in
section 843(b)'s language on that point. See id. at 264. However,
given the scarcity of authority mandating such an instruction,
combined with the nature of the alleged instructional error, we
cannot conclude that any error in the court's instructions was
"plain," see Olano, 507 U.S. at 734 (for the purposes of Rule
52(b), the word "plain" is synonymous with "clear," or,
equivalently, "obvious"), or that it affected Escobar's substantial
rights or denigrated the judicial proceedings, see Johnson, 520
U.S. at 467. 
III. The Jury Selection
We next consider Escobar's Batson-based claim that his
convictions must be vacated because of deficiencies in the jury
selection process. See Batson v. Kentucky, 476 U.S. 79 (1986). 
His argument, although difficult to parse, appears to be two-
pronged. First, he contends that the district court's conclusion
that he failed to establish a prima facie case of discrimination in
the government's use of its peremptory strikes was clearly
erroneous. Alternatively, he says that even if he did fail to
establish a prima facie case, the district court's erroneous ruling
on voir dire questions made it impossible for him to establish a
prima facie case. We disagree with both contentions. 
During the jury selection process, defense counsel 
requested the court to order that the government provide race-
neutral explanations for its peremptory strikes of two African-
American men, contending that these strikes demonstrated a
"pattern" of removing African-American men that raised an inference
of racial discrimination. The government denied that the strikes
were racially motivated, but did not offer a race-neutral
explanation. The court denied Escobar's request, reasoning that six
or seven African-American individuals remained in the jury pool and
that there was insufficient evidence to establish a "pattern" of
strikes. 
The three-part framework that must be applied to equal
protection challenges to the government's use of a peremptory
strike is well established. First, a defendant must make a prima
facie showing of discrimination in the government's use of its
peremptory strike. See Batson, 476 U.S. at 96-97. If the
defendant fulfills this requirement, the government must then
proffer a race-neutral explanation for having challenged the juror. 
See id. at 97. Finally, if the government meets its burden of
production by proffering a race-neutral explanation, the district
court must then decide whether the defendant has carried the
ultimate burden of proving that the government's use of its
peremptory strike constituted purposeful discrimination. See id.;
Hernndez v. New York, 500 U.S. 352, 358-59 (1991). In challenging
the government's use of peremptory strikes, the defendant retains
the burden of proof throughout. See United States v. Bergodere, 40
F.3d 512, 515 (1st Cir. 1994). 
Although the prima facie case requirement "is not
onerous, neither can it be taken for granted." Bergodere, 40 F.3d
at 516. To satisfy his burden of establishing a prima facie case,
Escobar was required to have shown, inter alia, "circumstances
sufficient . . . to raise an inference that the prosecutor struck
the venireperson on account of race." Id. All relevant
circumstances are to be considered in determining whether the
defendant has established a prima facie case, see Batson, 476 U.S.
at 96-97; Chakouian v. Moran, 975 F.2d 931, 933-34 (1st Cir. 1992),
and the district court's ruling on this fact-sensitive question
must be upheld unless it is clearly erroneous, see Bergodere, 40
F.3d at 516. 
Although it is true that a "pattern" of strikes against
African-Americans is one circumstance which may raise an inference
of discrimination, see Batson, 476 U.S. at 97, the district court's
conclusion that the government's two strikes failed to demonstrate
such a "pattern" was not clearly erroneous, particularly in light
of the court's observation that six or seven African-Americans were
seated in the jury pool at the time of the strikes and that six or
seven African-Americans were eventually selected to serve on the
jury. See, e.g., United States v. Sangineto-Miranda, 859 F.2d
1501, 1521-22 (6th Cir. 1988) (noting that composition of the
ultimate jury sworn may be relevant to Batson prima facie inquiry). 
Moreover, Escobar does not suggest, nor do we discern, that the
prosecutor's questions and statements during the voir dire
examination of potential jurors raise any inference of racially
motivated strikes. See id. (noting that "the prosecutor's questions
and statements during voir dire examination and in exercising his
challenges may support or refute an inference of discriminatory
purpose"). We find no clear error in this case. 
Alternatively, Escobar points out that during voir dire
he proposed that the district court ask potential jurors questions
related to racial bias, which he argued were necessary because
Escobar is African-American and because "there is racism in Puerto
Rico." The court denied the request, reasoning that there was no
indication that racial animosity or racial motive was an issue in
the case. Escobar now claims that the court's refusal to question
jurors about their potential racial bias hindered his later efforts
to establish a prima facie case of discriminatory intent in the
government's use of its peremptory strikes to remove the two
African-American men during the jury selection process.
To the extent that Escobar does in fact challenge
directly the court's denial of his request to question potential
jurors about racial prejudice (and it is unclear whether he makes
this challenge), we find that the voir dire conducted in this case
was sufficient. While the Supreme Court has held that under
certain circumstances the possibility of racial prejudice makes
special voir dire questioning constitutionally mandated, see Turner
v. Murray, 476 U.S. 28 (1986) (involving sentencing of black
defendant who had been convicted of a capital offense); Ham v.
South Carolina, 409 U.S. 524 (1973)(involving black civil rights
activist whose defense to drug charge was that he had been framed
by white police), voir dire ordinarily need not include questions
regarding racial prejudice, see United States v. Brown, 938 F.2d
1482, 1485 (1st Cir. 1991). "The mere fact that a defendant is
black does not alone trigger the special questioning requirement
found in Ham and Turner." Id. Rather, it is "[o]nly when there
are more substantial indications of the likelihood of racial or
ethnic prejudice" that a trial court is required to ask potential
jurors about the issue of racial bias. Id. (quoting Rosales-Lpez
v. United States, 451 U.S. 182, 190 (1981)). The only
justifications for the special questioning asserted by defense
counsel were that his client is African-American and that "racism
exists in Puerto Rico." Standing alone, these are not the special
circumstances that would require a district court to ask potential
jurors if racial prejudice would be a factor in their decision-
making process. 
Furthermore, we fail to perceive how the district court's
refusal to question jurors about racial bias impeded Escobar's
ability to establish a prima facie case of discrimination in the
government's use of its peremptory strikes, and Escobar does not
adequately explain the connection. Even if the court had granted
Escobar's request to question potential jurors about racial bias,
such questioning would have revealed only the potential jurors'
racial biases, enabling either party to remove prejudiced jurors
for cause. We do not see how such questioning could have shed
light on the government's allegedly improper motives for exercising
its peremptory strikes, evidence of which was lacking in Escobar's
efforts to establish a prima facie case under Batson. 
Finally, Escobar challenges the constitutionality of 28
U.S.C. 1865(b)(2) & (3), which require that jurors be able to
speak the English language and be able to read, write, and
understand the English language with a degree of proficiency
sufficient to fill out satisfactorily the juror qualification form. 
Having previously considered and rejected this contention, see
United States v. Flores-Rivera, 56 F.3d 319, 326, 326 n.4 (1st Cir.
1995)(citing United States v. Aponte-Surez, 905 F.2d 483, 992 (1st
Cir. 1990)), we decline to revisit the issue.
IV. Prosecutorial Misconduct
Escobar claims that cooperating co-defendant Soto's
testimony created a false impression about the extent to which Soto
could benefit from pleading guilty and testifying for the
government, and that the prosecutor's failure to correct this
misleading testimony resulted in reversible error. We find nothing
false or misleading about Soto's testimony. 
Before Escobar's trial, Soto entered into a plea
agreement which provided, inter alia, that he would plead guilty to
a drug conspiracy count; that he understood that he may be
sentenced to a term of imprisonment not less than ten years; that
he acknowledged that the government could move the court to impose
a sentence below the sentencing range dictated by the sentencing
guidelines based on his substantial assistance; and that if he
fully complied with the agreement, the government would not
prosecute him for other drug crimes resulting from information
provided by him and that the government would move to dismiss the
remaining charges against him. 
During the trial, Escobar's defense counsel cross-
examined Soto about the plea agreement, asking inter alia whether
Soto was aware that the government had the discretion to move the
court to impose a sentence of less than ten years. Soto responded
that he was not aware of this; that he expected to receive a
sentence of eight to ten years instead of the thirty years to life
which would have been imposed if he had not entered into the plea
agreement; and that he had discussed the plea agreement with his
attorney only in a "overall way" and not "part by part." Escobar
now claims reversible error based on Soto's failure to disclose
that the government could move the court to impose a sentence below
the statutory minimum and the government's silence on the matter. 
It is true, of course, that the government may not
knowingly use false testimony to obtain a conviction, even if the
false testimony goes only to a witness's credibility. See Napue v.
Illinois, 360 U.S. 264, 269 (1959) (finding due process violation
where witness falsely denied that he would receive any benefit from
government in exchange for his testimony). In this case, however,
Soto's testimony simply cannot be characterized as false or
misleading. First, the plea agreement itself simply stated that
the government had the discretion to move the court to impose a
sentence below the statutory minimum. The government had not
promised to file such a motion. Moreover, Escobar points to
nothing in the record suggesting that Soto was not truthful about
his understanding of the plea agreement and what his sentence was
likely to be. When questioned about the numerous benefits he had
been promised pursuant to the agreement, Soto testified
forthrightly, and there can be little doubt that the jury was
presented with sufficient evidence to allow it to make a
discriminating appraisal of Soto's motives to testify. See United
States v. Devin, 918 F.2d 280, 293 (1st Cir. 1990). 

V. Evidentiary Matters
A. The March 26, 1986 Lajas Incident
Escobar argues that the court erred by allowing the
introduction of evidence, including the testimony of co-operating
co-defendant Soto, concerning the March 26, 1986 airdrop at Lajas
("the Lajas incident"). Escobar characterizes the Lajas incident
as evidence of a prior bad act, and contends that the district
court erred by concluding that it was admissible under Fed. R.
Evid. 404(b) as proof of the Escobar organization's modus operandi,
or, alternatively, as proof of the knowledge and intent of the
organization's members to carry out a major drug trafficking
scheme. 
The district court's pre-trial order denying Escobar's
motion in limine, however, did not premise the admissibility of the
Lajas incident evidence solely on Rule 404(b) grounds. Rather, the
court also ruled that the Lajas incident evidence was not "prior
bad act" evidence at all, as the incident fell within the temporal
scope of the conspiracy alleged in the indictment and pertained to
the same conspiracy alleged in the indictment. Because we agree
with the latter theory of admissibility, we need not address the
district court's determination that the evidence was admissible
under Rule 404(b). See United States v. Arboleda, 929 F.2d 858,
865 (1st Cir. 1991); United States v. Tejada, 886 F.2d 483, 487
(1st Cir. 1989). 
The indictment alleged that the conspiracy began "on or
about April 1986." The Lajas incident occurred on March 26, 1986. 
Given the closeness in time of the Lajas incident to April 1986, we
have little difficulty concluding that the Lajas incident is fairly
encompassed by the temporal scope of the conspiracy alleged in the
indictment. See United States v. Paredes-Rodrguez, 160 F.3d 49,
56 (1st Cir. 1998) ("reference to approximate dates in an
indictment is not binding and thus the scope of the indictment may
cover prior events") (citing United States v. Fisher, 3 F.3d 456,
461 n.12 (1st Cir. 1993); United States v. Crocker, 788 F.2d 802,
805 (1st Cir. 1986) ("approximate dates in an indictment are not
controlling")); see also United States v. Morris, 700 F.2d 427, 429
(1st Cir. 1983) ("Where a particular date is not a substantive
element of the crime charged, strict chronological specificity or
accuracy is not required."). Moreover, the temporal proximity and
factual similarity of the Lajas incident and the April 14th alleged
airdrop provide adequate evidence that the Lajas incident stemmed
from the same conspiratorial agreement to import and distribute
cocaine. The events were separated by a period of only two-and-a-
half weeks, employed nearly identical means (e.g., an airdrop at a
clandestine airstrip illuminated by battery-powered lights), and
involved the same illegal purpose of importing and distributing
cocaine. In these circumstances, we conclude that the Lajas
incident served as an additional overt act within the conspiracy
charged, and was properly admitted as direct evidence of the
conspiracy itself. See Tejada, 886 F.2d at 487 ("Where evidence of
'bad acts' is direct proof of the crime charged, Rule 404(b) is, of
course, inapplicable."). 
B. The 1988 Heroin Purchase
At trial, cooperating co-defendant Rosa Rodrguez-Campos
("Rodrguez") testified pursuant to a plea agreement that she was
a long-time drug trafficker and that in 1990 she agreed to loan
Escobar money to finance his importation of cocaine from Colombia
to Puerto Rico. As part of its direct examination of Rodrguez
concerning her role in the alleged conspiracy, the government
sought to introduce her testimony that Escobar purchased $90,000
worth of heroin from her in 1988. The district court allowed
Rodrguez to testify that Escobar had purchased heroin from her,
reasoning that the heroin purchase, although uncharged in the
indictment, was relevant and admissible because it helped to
explain the history between Rodrguez and Escobar and her
willingness to finance Escobar's cocaine trafficking venture. 
Escobar claims that the district court erred by admitting this
testimony concerning the heroin transaction, arguing that it was
outside the scope of the charged conspiracy (which pertained only
to cocaine, not heroin) and that it was elicited solely for the
purpose of showing his propensity to commit drug crimes in
violation of Fed. R. Evid. 404(b).
Evidence that a defendant on trial for one crime has been
involved in another crime or bad act is inadmissible under Fed. R.
Evid. 404(b) if it is offered solely to prove the criminal
character of the defendant or his propensity to commit crimes of
the sort for which he is on trial. See United States v.
Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996); United States v.
Johnston, 784 F.2d 416, 423 n.10 (1st Cir. 1986) (citing United
States v. Zeuli, 725 F.2d 813, 816 (1st Cir. 1984)); United States
v. Fosher, 568 F.2d 207, 212 (1st Cir. 1978). Rule 404(b),
however, is not exclusionary. See Fosher, 568 F.2d at 212; 2 Jack
B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, 
404.20[3] (2d ed. 1997). Rather, the rule permits the introduction
of uncharged bad act evidence if the evidence is relevant for
purposes other than proof of a defendant's bad character or
criminal propensity, subject only to the limitations of Rule 403. 
See United States v. Spinosa, 982 F.2d 620, 628 (1st Cir. 1992);
Johnston, 784 F.2d at 423 n.10 (citing Fosher, 568 F.2d at 212). 
In a conspiracy case, evidence of other bad acts, subject
always to the requirements of Rule 403, can be admitted to explain
the background, formation, and development of the illegal
relationship, see United States v. Prevatte, 16 F.3d 767, 775-76
(7th Cir. 1994); United States v. Jones, 982 F.2d 380, 382-83 (9th
Cir. 1993); United States v. Passarella, 788 F.2d 377, 383-84 (6th
Cir. 1986); United States v. Magnano, 543 F.2d 431, 435 (2d Cir.
1976); and, more specifically, to help the jury understand the
basis for the co-conspirators' relationship of mutual trust, see
United States v. Love, 134 F.3d 595, 603 (4th Cir. 1998); United
States v. Pipola, 83 F.3d 556, 565-56 (2d Cir. 1996); United States
v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); United States v. Daz,
994 F.2d 393, 395 (7th Cir. 1993). As the district court observed,
see supra note 19, the heroin purchase was important to show how a
relationship of trust had developed between Escobar and Rodrguez
through other similar drug transactions, which in turn explained
why Rodrguez would have agreed to finance Escobar's cocaine
trafficking venture as she claimed. Such evidence was specially
probative of the conspiratorial agreement that existed between
them, a fact which was directly in issue and material to the case.
See United States v. Spaeni, 60 F.3d 313, 316 (7th Cir. 1995). 
Moreover, the potential of prejudice from the heroin
purchase evidence, although undeniably present in some quantum, did
not substantially outweigh its probative value. Rodrguez's
testimony regarding the heroin purchase, although brief, was
critical to set the stage for the rest of her testimony concerning
the formation, nature, and extent of her conspiratorial
relationship with Escobar, and it represented only a tiny fraction
of the incriminating evidence presented to the jury during the
course of the trial. In these circumstances, we find no abuse of
discretion in the district court's decision to admit the challenged
testimony. 
C. The Wiretap Evidence 
Escobar challenges the district court's denial of his
motion to suppress evidence derived from intercepted telephone
communications, which he says violated Title III of the Omnibus
Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510-2522. 
In March 1990 the district court issued a wiretap order
authorizing the interception of communications on telephone line
809-256-2600, which was installed at Escobar's business, Sueo Real
Construction Company ("Sueo Real"). According to the district
court's findings (which are not challenged on appeal), Escobar
broke the telephone's receiver in February or March 1990 and
refused to pay the telephone bills after becoming upset that people
had used the Sueo Real telephone to make long-distance phone
calls. Cedrs thereafter "extended a phone line" to Cedrs's
grocery business, Colmado El Coqu, which was adjacent to Sueo
Real, and paid the phone bills to keep the line in service. 
Escobar knew that Cedrs had extended the phone line, and in fact
used the extension line in Colmado El Coqu himself on several
occasions.
Escobar argues that the intercepted communications must
be suppressed because they occurred at Colmado El Coqu, rather
than at the location specified in the wiretap order, Sueo Real. 
To support this contention Escobar relies on 18 U.S.C. 2518(4),
which provides that the order authorizing an interception specify
five items, including "the nature and location of the 
communications facilities as to which, or the place where,
authority to intercept is granted." 18 U.S.C. 2518(4)(b). The
order's authorization, he argues, was limited to the telephone line
at issue, which in turn was limited to the confines of Sueo Real. 
We agree that by its terms the order authorized
interception of conversations occurring on the telephone line
denominated 809-256-2600, which was located in Sueo Real. We find
nothing in the statute, however, that requires the wiretap order to
have identified the particular locations of various extensions of
that telephone line, nor does Escobar cite any authority for that
proposition. The telephone line remained located in Sueo Real, as
provided in the wiretap order, even though it had apparently been
rigged with a long extension cord to enable a person to access the
line from a remote location (i.e., the adjacent Colmado El Coqu). 
Moreover, assuming arguendo that section 2518(4)(b) does
require an order to identify the particular locations of various
extensions of the same telephone line, it is well-settled that not
every failure to comply fully with any requirement provided in
Title III necessitates suppression. See United States v.
Cunningham, 113 F.3d 289, 293-94 (1st Cir. 1997); see also United
States v. Donovan, 429 U.S. 413, 433-34 (1977); United States v.
Chavez, 416 U.S. 562, 574-75 (1974); 18 U.S.C. 2515,
2518(10)(a). Rather, "violations of even . . . central
requirements do not mandate suppression if the government
demonstrates to the court's satisfaction that the statutory purpose
has been achieved despite the violation." Cunningham, 113 F.3d at
293-94 (quoting United States v. Johnson, 696 F.2d 115, 121 (D.C.
Cir. 1982)). To the extent that Title III is designed to protect
privacy interests similar to those reflected in the Fourth
Amendment, see id. at 294, that statutory purpose was served by the
district court's finding of probable cause to intercept and by the
order's inclusion of other items of particularity, including the
identity of the person whose communications were to be intercepted,
the nature and location of the telephone line to be intercepted, a
particular description of the type of communication sought to be
intercepted, and a statement of the particular offense to which the
communications relate, see 18 U.S.C. 2518(4). Inclusion of the
particular location of various extensions of the telephone line
(whose location was properly identified in the order) would not
have substantially furthered the statutory objectives of protecting
privacy interests and ensuring that intercept procedures are used
only in "those situations clearly calling for the employment of
this extraordinary investigative device." United States v.
Giordano, 416 U.S. 505 527 (1974). The district court properly
denied Escobar's suppression motion. 

VI. Variance
Escobar contends that his conviction on Count 20,
charging him with attempted importation, must be reversed because
of a fatal variance between the indictment and the evidence offered
at trial. Count 20 of the indictment charged, inter alia, that the
March 13, 1990 attempted importation took place "at Guayama, Puerto
Rico, in the District of Puerto Rico, and elsewhere and within the
jurisdiction of this Court." At trial, informant Cedrs testified
that the attempted importation took place "around the town of
Gunica, that part of the southern coast of Puerto Rico." Escobar
moved to strike all evidence related to Count 20 because the
indictment referred to Guayama, not Gunica. Noting that both
towns were in the southern part of Puerto Rico and that they were
"not that far apart," the district court denied the motion. 
A variance arises when the proof at trial depicts a
scenario that differs materially from the scenario limned in the
indictment. See United States v. Paredes-Rodrguez, 160 F.3d 49,
56 (1st Cir. 1998); United States v. Arcadipane, 41 F.3d 1, 6 (1st
Cir. 1994); United States v. Vavlitis, 9 F.3d 206, 210 (1st Cir.
1993). A variance requires reversal of a conviction "only if [the
variance] is both material and prejudicial, for example, if the
variance works a substantial interference with the defendant's
right to be informed of the charges laid at his doorstep." 
Arcadipane, 41 F.3d at 6. Where an indictment gives a defendant
"particular notice of the events charged, and the proof at trial
centers on those events, minor differences in the details of the
facts charged, as contrasted to those proved, are unlikely to be
either material or prejudicial." Id. 
We note preliminarily our reluctance to characterize what
happened here as a variance at all, given the breadth of the
indictment's description of the physical location of the attempted
importation ("Guayama, Puerto Rico, in the District of Puerto Rico,
and elsewhere and within the jurisdiction of this Court") and the
ambiguity of Cedrs's testimony (namely, that the attempted
importation took place "around the town of Gunica, that part of
the southern coast of Puerto Rico"). In any event, whatever
discrepancy may have existed between the indictment and the
evidence adduced at trial was neither material nor prejudicial. 
The location of the attempted importation was not an element of the
crime; both towns are in southern Puerto Rico, and are within the
district court's jurisdiction; and Escobar does not contend that
the indictment's allegations caused him to be misinformed of the
charges against him. In his closing argument to the jury, Escobar
pointed out the purported variance and other evidence that he
considered to be contradictory. It was the jury's province to
resolve any conflicts in the evidence about the attempted
importation, see United States v. Angiulo, 847 F.2d 956, 967 (1st
Cir. 1988), and it rejected Escobar's arguments. In these
circumstances, we find no merit to Escobar's claim of a fatal
variance. 
VII. Sufficiency of the Evidence
Escobar challenges the sufficiency of the evidence
supporting his convictions on the CCE counts (counts 1 and 12); the
assault counts (counts 5 and 6); the weapons counts (counts 7, 15,
16); and one interstate travel count (count 18). In considering
his sufficiency challenges, we must take the evidence in a light
most favorable to the verdicts, drawing all plausible inferences
and resolving all credibility determinations in their favor. See
United States v. David, 940 F.2d 722, 730 (1st Cir. 1991). The
evidence may be entirely circumstantial, and the government need
not disprove every hypothesis of innocence. See Rodrguez, 162
F.3d at 141; United States v. Hahn, 17 F.3d 502, 506 (1st Cir.
1994) (quoting United States v. Batista-Polanco, 927 F.2d 14, 17
(1st Cir. 1991)). We must affirm the verdicts "so long as any
rational trier of the facts could have found the essential elements
of the crime[s] beyond a reasonable doubt." David, 940 F.2d at 730.
A. Continuing Criminal Enterprise 
A conviction under 21 U.S.C. 848 for engaging in a CCE
requires proof that the defendant (1) committed a felony drug
offense, (2) as part of a continuing series of such violations, (3)
in concert with five or more persons in relation to whom he acted
as a supervisor, organizer, or manager, (4) and from which he
obtained substantial income or other resources. 21 U.S.C. 848;
see United States v. Hahn, 17 F.3d 502, 506 (1st Cir. 1994); see
also United States v. Chagra, 653 F.2d 26, 27-28 (1st Cir. 1981)
(noting that courts have required three or more violations to
constitute a "continuing series"). Escobar asserts that the
government failed to establish the second, third, and fourth
elements of the CCE offense. 
As to the second element, Escobar contends (1) that the
evidence did not establish that the alleged violations were of a
"continuing" nature that is, that they were related to one
another, and (2) that the counts related to the 1990 planned
importations cannot constitute predicate offenses under the CCE
statute because those importations were too "inchoate and
incomplete." For the reasons previously set forth in part II(A)
supra, we find ample evidence of the relatedness of Counts 10, 19,
20, 23, 24, and 33. Furthermore, we find nothing in section 848
that limits predicate offenses to successful, completed drug
importations in the manner suggested by Escobar. See 21 U.S.C. 
848 (predicate offenses may consist of "violations of [subchapter
I] or subchapter II of [chapter 13]). 
Turning to the third element under the CCE statute,
Escobar argues that the government failed to prove that he
"occupie[d] a position of organizer, a supervisory position, or any
other position of management," 21 U.S.C. 848, with respect to at
least five individuals. In determining whether a defendant
organized, supervised, or managed a criminal enterprise, we give
those terms their ordinary meaning. See David, 940 F.2d at 731;
see also United States v. Rouleau, 894 F.2d 13, 14 (1st Cir. 1990)
(operative terms must be read in the disjunctive and are distinct
in their meaning). Further, there is no requirement that the five
individuals be shown to have acted in concert or contemporaneously,
see David, 940 F.2d at 731 (citing United States v. Tarvers, 833
F.2d 1068, 1075 (1st Cir. 1987)), nor must the jurors agree on the
particular identities of the henchmen, see id. (citing United
States v. Aiello, 864 F.2d 257, 264 (2d Cir. 1988); United States
v. Lueth, 807 F.2d 719, 731 (8th Cir. 1986)). 
In this case, Escobar does not expressly dispute that he
acted as an organizer, supervisor, or manager with respect to four
individuals. Indeed, there is ample evidence in the record that
Escobar acted in such capacity with respect to co-defendant Soto in
the March 5, 1990, telephone offense (Count 19); with respect to
Santos in the March 13, 1990 telephone offense (Count 20); and with
respect to co-defendants Ismael Santiago-Corujo ("Santiago") and
Flores during the conspiracy offense in connection with the April
1990 plans to import cocaine by sea (Count 2). Escobar does
dispute, however, that he acted as an organizer, supervisor, or
manager with respect to a fifth individual, co-defendant Rivera,
during the November 21, 1989, drug offense. Specifically, he
contends that the evidence showed that he had only "an interest" in
the transaction, given that Faccio, not he, was the original owner
of the cocaine. 
To be an organizer, supervisor or manager within the
meaning of 21 U.S.C. 848, however, the defendant "need not be the
dominant organizer or manager of the enterprise; he need only
occupy some managerial position with respect to five or more
persons." Rodrguez, 162 F.2d at 142 (quoting Hahn, 17 F.3d at 506
n.4)). As to the November 21, 1989 incident, there was evidence
that after receiving the cocaine from Faccio, Escobar delivered it
to Cedrs, who in turn arranged for Rivera and co-defendant Ros to
smuggle the drugs onto a commercial airline flight; that Escobar
purchased airline tickets; and that upon arriving in New York
Rivera called Escobar to report that the cocaine had been lost. 
Moreover, Cedrs testified generally that as to at least fourteen
individuals, including Rivera, Escobar was "the top man, the person
who would plan, the person who would organize and the person who
would order all aspects of the organization." This evidence was
sufficient for a rational jury to find that Rivera was acting under
the direction of Escobar on November 21, 1989 for the purposes of
the CCE statute. 
Finally, Escobar contends that the government failed to
prove that he obtained substantial income or other resources from
the CCE. The substantial income requirement is meant "to exclude
trivial amounts derived from occasional drug sales," Hahn, 17 F.3d
at 507, and may be proven directly (by evidence of revenue or
resources) or circumstantially (such as by evidence of the
defendant's position in the criminal organization and the volume of
drugs handled by the organization), see id. In this case, the
government introduced evidence showing that from 1985 to 1989
Escobar made expenditures of $238,766 for which no income source
could be identified; that in 1989 he spent approximately $300,000
in cash, $216,000 of which came from unidentified sources; and that
his net worth as of October 1989 was more than one million dollars. 
This evidence entitled the jury to conclude that Escobar obtained
"substantial income or resources" within the meaning of section
848. Although Escobar contends that the government's evidence
contained inconsistencies and that Escobar's flush financial
situation could have a benign explanation, he made those arguments
to the jury, which was free to reject them. See United States v.
Arango-Echeberry, 927 F.2d 35, 38 (1st Cir. 1991); United States v.
Angiulo, 847 F.2d 956, 967 (1st Cir. 1988). The evidence was
sufficient to support Counts 1 and 12. 
B. Assaults on the Customs Officers
Escobar argues that the court erred in instructing the
jury that it could convict on counts 5 and 6 (charging him with the
April 14, 1986 shootings of the customs officers) on the basis of
Pinkerton liability, as there was insufficient evidence to
establish his participation in a conspiracy on that date.
Specifically, Escobar contends that the absence of any direct
evidence of an importation actually having occurred on April 14th
made it impossible for any rational factfinder to conclude that a
conspiracy existed; and that, in any event, the evidence
established only his mere presence at the scene where some of the
conspiratorial activities allegedly took place. Without
sufficient evidence of his participation in a conspiracy on the
evening of April 14th, he argues, the Pinkerton instruction was
improper. 
To prove the elements of a conspiracy, the government
must show beyond a reasonable doubt that the "defendant and one or
more coconspirators intended to agree and . . . to commit the
substantive criminal offense which was the object of their unlawful
agreement." United States v. Tejeda, 974 F.2d 210, 212 (1st Cir.
1992) (quoting United States v. Lpez, 944 F.2d 33, 39 (1st Cir.
1991)) (alteration in original); see United States v. Cruz, 981
F.2d 613, 616 (1st Cir. 1992). No particular formalities attend
this showing: the agreement may be express or tacit and may be
proved by direct or circumstantial evidence. See United States v.
Seplveda, 15 F.3d 1161, 1173 (1st Cir. 1993); United States v.
Gmez-Pabn, 911 F.2d 847, 853 (1st Cir. 1990). Indeed, "[d]ue to
the clandestine nature of criminal conspiracies, the law recognizes
that . . . a common purpose and plan may be inferred from a
development and collocation of circumstances." Tejeda, 974 F.2d at
212 (quoting United States v. Snchez, 917 F.2d 607, 610 (1st Cir.
1990)) (internal quotation marks omitted). 
Applying these standards here, we conclude that there was
sufficient evidence to support the Pinkerton charge. First,
contrary to Escobar's assertion, the fact that the government
introduced no direct evidence of contraband having been imported by
plane on April 14th does not preclude the jury from concluding that
Escobar and his cohorts were engaged in a conspiracy to achieve
such ends. Proof of the conspiracy's objective having been
accomplished is not required to sustain a conspiracy conviction. 
See David, 940 F.2d at 735 (noting that "the law is well-settled
that a criminal conspiracy can exist despite the eventual failure
of its objective"). 
As to Escobar's claim that the evidence established only
his mere presence at the scene of the conspiratorial activities,
see, e.g., United States v. Ocampo, 964 F.2d 80, 82 (1st Cir.
1992), we disagree. Proof of participation in a conspiracy may
consist of circumstantial evidence, and jurors are "neither
required to divorce themselves from their common sense nor to
abandon the dictates of mature experience." United States v.
Ortiz, 966 F.2d 707, 712 (1st Cir. 1992). The government presented
evidence that on April 14th co-defendant Flores purchased more than
one hundred gallons of aviation gasoline; that Flores and co-
defendant Morales entered the Potrero Cuevas Farm in separate
vehicles; that law enforcement agents waiting nearby then heard a
plane flying overhead; that shortly thereafter agents observed
several vehicles exit the farm, including a truck driven by Escobar
that carried six passengers, four of whom were dressed in
camouflage; that a few days later agents searching the farm
discovered a clandestine landing strip, battery-powered lamps that
had been purchased by Escobar (one of which had Escobar's
fingerprints on it), and sixty gallons of missing aviation fuel. 
The jury was entitled to infer from this evidence Escobar's
participation, rather than mere presence, in the conspiratorial
activities. See United States v. Batista-Polanco, 927 F.2d 14, 18
(1st Cir. 1991); Tejeda, 974 F.2d at 213 ("[T]he factfinder may
fairly infer . . . that it runs counter to human experience to
suppose that criminal conspirators would welcome innocent
nonparticipants as witnesses to their crimes."). The evidence was
sufficient to support the Pinkerton charge. 
C. The Weapons Charges
Escobar was charged in Count 7 with possessing a machine
gun in violation of 18 U.S.C. 922(o)(1). In Counts 15 and 16,
he was charged with possessing firearms as a convicted felon in
violation of 18 U.S.C. 922(g)(1). With respect to both Counts
7 and 16, Escobar's main contention is that the uncorroborated
testimony of informant Cedrs concerning the weapons charges cannot
suffice to support his convictions. Cedrs's testimony, even if
uncorroborated, was sufficient to support Escobar's conviction
because it was not "incredible or insubstantial on its face." 
United States v. Gmez-Pabn, 911 F.2d 847, 853 (1st Cir. 1990)
(quoting United States v. Aponte-Surez, 905 F.2d 483, 489 (1st
Cir. 1990)). Escobar also claims that the evidence showed that he
was not the actual owner of the machinegun at issue in Count 7. 
There is nothing in the statute to suggest, however, that liability
under section 922(o)(1) turns on actual ownership; rather, that
section makes it unlawful to "transfer or possess" a machinegun. 
18 U.S.C. 922(o)(1).
As to Count 16, charging him with possessing a firearm as
a convicted felon, Escobar further contends that his possession of
the firearm at issue was too brief to support a conviction. Cedrs
testified that in January 1990 co-defendant Fernando Montaez-
Bultrn ("Montaez") gave the firearm to Escobar, and that at some
point thereafter Escobar gave the firearm to Cedrs with
instructions to keep it until Montaez and co-defendant Cruz asked
for it. This testimony is sufficient. Even if Escobar actually
possessed the firearm for a short period of time, duration of
possession is not an element of the statute. See 18 U.S.C. 
922(g)(1). Moreover, a defendant's possession need not be actual;
constructive possession is encompassed by section 922(g)(1) as
well. See United States v. Wight, 968 F.2d 1393, 1398 (1st Cir.
1992) (holding that "as long as a convicted felon knowingly has the
power and the intention at a given time of exercising dominion and
control over a firearm or over the area in which the weapon is
located, directly or through others, he is in possession of the
firearm"). 
Finally, with respect to Count 15, also charging him with
possessing a firearm as a convicted felon, Escobar notes that (1)
the firearm at issue was, under the government's theory of the
case, actually possessed by co-defendant Cruz and used to execute
Matos; and (2) the jury acquitted Cruz of the killing. Escobar
argues that Cruz's acquittal on the murder charge indicates that
there was insufficient evidence to show that Cruz actually
possessed the firearm; and that if there was insufficient evidence
to show that Cruz actually possessed the firearm, then a fortiori
there was insufficient evidence to show that Escobar constructively
possessed the firearm. The logic of Escobar's argument falters at
the threshold. Cruz's acquittal on the murder charge does not
establish that Cruz did not actually possess the firearm in
question, nor does it establish that Escobar did not constructively
possess the firearm. Moreover, even if the verdicts were
inconsistent (which they are not), this would not justify the
vacation of Escobar's conviction under Count 15. See United States
v. Powell, 469 U.S. 57, 69 (1984). The evidence was sufficient to
support the challenged weapons convictions.
D. The March 1990 Interstate Travel Charge
Finally, Escobar challenges the sufficiency of the
evidence supporting his conviction on Count 18 for aiding and
abetting the interstate travel of co-defendant Jorge "Papo Luciano"
Valds-Alvarez ("Valds") to promote Escobar's drug trafficking, in
violation of 18 U.S.C. 1952 & 2. To establish a violation of
section 1952, the government must prove: (1) interstate travel or
use of an interstate facility; (2) with the intent to distribute
the proceeds of or otherwise promote, manage, establish, carry on,
or facilitate an unlawful activity; (3) followed by performance or
attempted performance of acts in furtherance of the unlawful
activity. See United States v. Arruda, 715 F.2d 671, 681 (1st Cir.
1983); United States v. Coran, 589 F.2d 70, 72 (1st Cir. 1978). 
While Escobar concedes that Cedrs's testimony may have established
that Valds traveled from Miami to Puerto Rico (a necessary
concession in light of the evidence), Escobar nonetheless contends
that the evidence was insufficient to establish that Valds'
purpose in such travel was "to promote, manage, establish, carry
on, or facilitate" Escobar's drug trafficking operation. Cedrs
testified, however, that after the attempted importation of March
13, 1990, Escobar spoke of using a friend from Miami, "Papo
Luciano," to assist in the importation of drugs through the
northeastern coast of Puerto Rico; and that in a recorded telephone
conversation, Escobar mentioned a "Georgie" whom he had brought to
Puerto Rico from Florida to participate in shipments that were
being planned through the northeastern coast of Puerto Rico. This
unambiguous testimony was sufficient to allow the jury to conclude
beyond a reasonable doubt that Valds had traveled to Puerto Rico
intending to promote, manage, establish, carry on, or facilitate
Escobar's drug trafficking activities, and not for some lawful
purpose. 
VIII. Conclusion
For the foregoing reasons, we affirm Escobar's
convictions in all respects.
Affirmed.